RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0308p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MIMI MECE and ARDITA MECE,

　　　　　　　　　　　*Petitioners,*

　　　　*v.*

No. 03-4082

ALBERTO GONZALES, Attorney General,

　　　　　　　　　　　*Respondent.*

On Petition for Review of a Decision
of the Board of Immigration Appeals.
Nos. A95 406 648; A95 406 649.

Argued: February 1, 2005

Decided and Filed: July 20, 2005

Before: NELSON and SUTTON, Circuit Judges; WELLS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Richard A. Kulics, IMMIGRATION LAW CENTER, Birmingham, Michigan, for Petitioners. Jennifer Keeney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Richard A. Kulics, IMMIGRATION LAW CENTER, Birmingham, Michigan, for Petitioners. Jennifer Keeney, Emily A. Radford, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

　　　　DAVID A. NELSON, Circuit Judge. Rejecting an Albanian couple's application for asylum — an application based on a claim of political persecution — an immigration judge ordered the couple removed from the United States. The Board of Immigration Appeals dismissed an administrative appeal, and the matter is now before this court on a petition for review.

　　　　The petition will be granted. The record contains compelling evidence that one of the petitioners was repeatedly detained and beaten by Albanian police officers as a result of his political activities on behalf of the Democratic Party of Albania; that on the last such occasion the authorities fractured the petitioner's left shoulder and charged him, on pain of death, not to go to the hospital

---

[*] The Honorable Lesley Wells, United States District Judge for the Northern District of Ohio, sitting by designation.

or tell anyone what had been done to him; that the petitioner sought treatment in a hospital located at some remove from the town where he lived; and that the petitioners then remained in hiding at a remote location for approximately five months before departing for North America.

The petitioners' story is a dramatic one, and our government's handling of the subsequent asylum request has a certain fascination of its own. Having found it difficult to do justice to the story and the bureaucracy's response to it without going into some detail, we have been more expansive here than usual. We regret the prolixity, but trust that the reader who bears with us to the end will be reasonably clear as to the basis of our decision.

It seems to us that *any* reasonable adjudicator would necessarily conclude that the petitioners suffered "persecution" because of "political opinion" within the meaning of § 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42). See 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). The Board's dismissal of the administrative appeal will be vacated, and the case will be remanded with instructions that the case be reheard by a different immigration judge.

I

Petitioner Mimi Meçe, the husband of petitioner Ardita Meçe, was born on November 20, 1971, in the village of Erseka, located in the district of Kolonja, Albania, near the border with Greece. The record contains an authenticated English translation of Mimi Meçe's birth certificate.

The record also contains a certificate attesting to the "Politically Persecuted" status of Mr. Meçe's uncle, who for more than 16 years was a political prisoner of Albania's late Communist regime.[1] A document issued by the Kolonja branch of the "Association of Former Political Persecuted and Anti-Communist Democrats" says that petitioner Mimi Meçe himself "has been politically persecuted from his uncle who has been imprisoned from the communist dictatorship." Petitioner Mimi Meçe's grandparents on both sides were active anticommunists as well, the petitioner has declared under penalty of perjury, and so was his father.

Soon after the petitioner was born, according to the written declaration incorporated in his asylum application,

> "my father was taken out of Erseka to a labor camp in the northern part of the country, as retaliation for his political activism against the government. He was kept confined and mandated to perform hard work in the camp for nine years. The regime called this practice 'reeducation and rehabilitation of the political enemy' as the subjects were constantly brainwashed with communist ideology in the camp. After an indescribable misery and suffering, my father was allowed to return to Erseka in 1980, supposedly 'reeducated', but he never surrendered his ideals and efforts for a free and democratic Albania."

As a youth, the declaration says, the petitioner was told by his teachers that he could not pursue a higher education since he belonged to an "enemy family." When he was a junior in high school, a paper he had written advocating that Albania allow foreign investments and a free market economy precipitated the following chain of events:

---

[1]"The status of formerly politically persecuted persons, established by law, ostensibly provides tangible benefits in such areas as education, employment and financial assistance; however, no government since 1992 has been able to fulfill these promises." U.S. Dept. of State, Bureau of Democracy, Human Rights and Labor, "Albania: Profile of Asylum Claims and Country Conditions," May 2001.

"[T]wo Sigurimi operatives [secret police agents] came to my classroom, dragged me in front of the class and severely beat on me for what I had done. Then, they took me to the police station of Erseka, where I was kept for one week. [This is Meçe's first mention of a visit to the Erseka police station. As we shall see, the visit was not to be his last.] While in the police station, I was beaten up, tortured and interrogated. They wanted to know from whom I had gotten that idea, with whom I had discussed it and whether I knew anybody else who shared the same idea as mine. They forced me admit that I had heard my father discussed such things in the family, but I refused by stating that it was only my personal vision about the future of my country. When I went back to school, I was told by the principal that I was suspended from school for an unlimited time and also dismissed from the Youth Organization. From that moment, my classmates were afraid to associate with me, as they were afraid they would be labeled as 'enemies'. It was not until 1991, after the fall of the Communist regime that I could go back to school."

As the former regime neared its end, the petitioner went to Tirana, Albania's capital, to participate in demonstrations condemning the communist system and demanding the release of political prisoners and the organization of multi-party elections. When the regime fell, the petitioner became a member of the Democratic Party and helped establish a branch of the party in Kolonja. (The record contains a document in Albanian, with an English translation, in which the chairman of the Kolonja branch certifies "that Mr. Mimi Mece, born in the town of Erseka on November 20, 1971, has actively participated in the Anti-Communist and Democratic movement of December 1991, and is a member of the Democratic Party of Albania since that year." No serious question has been raised as to the authenticity of this document.)

The Democratic Party assumed power in 1992. In 1997, however, following the collapse of pyramid schemes with which the Democrats had been associated, the Socialist Party — the political coloration of which Mr. Meçe describes as "neo-communist" — assumed control of the government. Mr. Meçe's declaration asserts that many former Sigurimi agents resumed work for the state at that time.

Sigurimi alumni or not, the post-1997 Erseka police force seems to have taken a decidedly dim view of Mr. Meçe's continued political activism. In mid-January of 1998, according to his declaration, Mr. Meçe participated in demonstrations intended to support a national hunger strike organized to protest the new Socialist government's abrogation of a law that had prohibited the rehiring of former Sigurimi agents. The police beat him with rubber sticks, Meçe declared, threw him handcuffed into a police van, punched him repeatedly in the face, and kept him in police cells overnight while interrogating him about his work in support of the "Association of Former Politically Persecuted" and the Democratic Party. Mr. Meçe's account of this episode continues as follows:

"I was told to stop my political activism, or otherwise face severe consequences. The person who interrogated me seemed to be well informed about all my activities and political affiliation. He also knew well the history and activity of my family, as he frequently made reference to my father, my uncle and my grandfather and mentioned how they had suffered because of refusing to comply with the regime's rules. * * *We [the petitioner and four other demonstrators] were kept there for the entire night, in the midst of a cold winter. We asked for some water and food, but neither was given to us. We were all released the following day and commanded to shut our mouths and not tell anyone what we had experienced, or otherwise face fatal consequences. I was specifically told to stop my political activities and withdraw from the political groups I belonged to."

In his written declaration, Mr. Meçe neglected to say that he had been roughed up once he was inside the police station. In his oral testimony, however, which was delivered through an interpreter, he said that "the police held me overnight during which they beat me up, threatened me by my life, and maltreated me." Mr. Meçe was asked on cross-examination why his written declaration — which adverted, of course, to maltreatment and threats on his life — omitted mention of his having been beaten up at the police station. Such an omission, Mr. Meçe insisted, was "impossible." (The declaration, in English, runs nearly 15 typewritten pages in length. The English version was prepared by a translator who signed a statement attesting that he had read the declaration to Mr. Meçe in Albanian before Meçe signed the application of which the declaration is a part.)

In September of 1998 — the month following his marriage to co-petitioner Ardita Meçe — Mr. Meçe was again detained at the Erseka police station. This time, according to his declaration, the reason was Mr. Meçe's attendance in Tirana at the funeral of Azem Hajdari, an anti-communist leader who, according to the U.S. State Department, had been murdered. Mr. Meçe's written account of his experience with the police following his return to Erseka after the Hajdari funeral included an unambiguous reference to a beating administered inside the police station:

> "The police wanted to hear from me names of other members and supporters of opposition, who had participated in the funeral of Mr. Azem Hajdari. Although I had seen some of the members of the Democratic Party for the district of Kolonja who participated that funeral in Tirana, I did not tell them anything, as I did not want to expose them to the harm of the police. Then, I was severely beaten up by two policemen and threatened with murder. I remember them saying: 'If you don't give up your political activities in support of the Democratic Party, pretty soon we will participate in your funeral.'"

Mrs. Meçe confirmed this incident in her testimony, stating that "my husband came beaten at home, told me how the events that occurred." She said that she saw "[s]tripes of being beaten with a rubber stick in the body . . . ."

Mr. Meçe's declaration attests that the police detained him yet again in October of 1999. He had signed a petition seeking the release of political activists imprisoned by the Socialists, the declaration explains, and had participated in a rally calling on others to sign the petition. Thereafter, according to the declaration,

> "The Sigurimi agents came to my house at dawn and showed me a copy of the petition with my name on it. I admitted to having signed it and told them that we felt fearful of living in our country because of the government's repression. They responded by saying that there would be no freedom for people like us, who had always opposed the government. They asked me to go with them to the station, but I refused, maintaining that I had done nothing wrong. At that point, one of them pulled out his gun and pointed at me commanding me to 'move' or he would kill me. Although I didn't believe he would kill me in front of my house, I was terrified to see the gun pointed at me. I then decided to go with them to the station."

Mrs. Meçe confirmed this part of Mr. Meçe's testimony as well. She testified that she saw the pistol put to Mr. Meçe's head and saw him taken away.

At the station, Mr. Meçe's declaration avers,

> "they kept me confined for one day, during which time I was exercised brutal psychological and physical pressure. I was beaten severely two times and I was threatened with murder as well. At one point they got so angry with me that they

said they would eliminate me 'right here, right now', if I would continue to raise my voice against the government.  I was released the next day and told to not share the story with anyone else.  I was place[d] under house surveillance for two weeks . . . ."

When Mr. Meçe came home from the police station, his wife testified, he had wounds on his legs and his eyes were swollen.

Local elections took place in Erseka at the end of October, 2000, and Mr. Meçe represented the Democratic Party at a polling place located in a school building.  The declaration describes what happened to him on this occasion as follows:

"During the voting process I saw many irregularities.  I saw many Socialist Party members and supporters were given more than one ballot while many members and sympathizers of the Democratic Party had their names removed from the voters' lists. I also saw people not from our town voting by using faked identification documents. At the end of the voting process, I was asked to sign the closing statement, by which I would declare that the voting process went in conformity with the electoral law. I saw irregularities all day long, so I could not legitimize something that was illegitimate, especially after I witnessed that many ballots pro Democratic Party candidate were qualified as 'not valid'.  Immediately, the chairman [a former Sigurimi agent] demanded to see me in privacy in one of the empty classrooms. Once we entered the room, he addressed me in a threatening voice, saying: 'Listen you stupid, if you don't sign the statement, you will regret it.  Sign it now and keep your mouth shut or don't sign it and you will be dead, because we are winning regardless'.  I did not agree to sign the closing statement.  Then, he ordered me to live [sic] the room.  After approximately fifteen minutes two men came in, and without asking any question dragged me out of the building, where I realized that the two guards of the voting station, who were supposed to be there till around 12:00 at night, had disappeared.  There, those men gave me the statement and ordered me to sign.  I refused.  Then, one of them punched so hard on my face, so I fell down. Then, the other one grabbed me by my neck, stood me up and ordered me again to sign the statement, but I refused.  They continued to beat on me for several minutes and ordered me not to go back to the voting station.  They also threatened me with instant murder if I would speak out against the manipulation I witnessed during the voting process.  At that moment I had no choice but to go home."

The Socialists won the local election, and the Democrats organized what Mr. Meçe characterizes as peaceful protests.  He was a participant in one of the demonstrations.  The consequences of that participation are described thus in his declaration:

"On November 09, 2000, I participated a peaceful demonstration in the center of Erseka, where I delivered a short speech using a megaphone.  I called upon all people of district of Kolonja to join us and denounce the election fraud.  At about 8:00 PM, I was returning back home.  As I was approaching my house, an old car type 'Mercedes' drove by me.  When the car came in parallel position with me, the person who was in the passenger's side unexpectedly opened the door and hit me with that while the car was still running.  I fell on the ground.  Then, three special force policemen with black masks got out of the car.  I was terrified beyond comprehension and desperately started to shout for help.  As soon as the first words came out of my mouth they jumped over me by punching and kicking me.  They handcuffed my hands in the back and scrolled me towards their car.  They put me in the car and drove to the police station.  In the car, they hit me on my face several

times and threatened that they would kill me if I would continue to support the Democratic Party and participate in the demonstrations. I was taken to the police station and was thrown into one of its cells. In about two hours, two policemen took me to another room, where two civilians were waiting. Once I was set down on a chair, one of the civilians asked me about my political affiliation and activities. I answered that I was a member of the Democratic Party of Albania, and a member of the Association of Former Politically Persecuted. Then he suddenly hit me with the back of his pistol behind my head and said: 'We know that, but we want to know who organized the demonstration today'. I told them the Democratic Party branch and not particular individuals organized the demonstration. Then, they started to barbarically hit and kick on me till I was covered on blood. I was screaming out of pain, but that seemed to excite them. But this was not the end. They ordered me to take off my shoes and my socks, and tied me up on the chair I was sitting and pushed it on the ground. They started to hit me on my feet with a rubber stick till they turned black of bruises. Then they untied me off the chair and ordered me to stand still. I could not resist the pain, so I fell on my knees begging them to stop torturing me. Unfortunately, as a response, one of the policemen, aiming my head, hit me with the back of his rifle. I moved my head, but I could not save my sinister bone, which got broken. The policeman hit me again, this time behind my head, and I got unconscious. Next thing that I remember is that I was laid on the floor of the cell and I could hardly move. I had severe pain on my left shoulder. In the morning the same policemen took me back to the room I was tortured, where they forced me to sign a declaration that I was only interrogated about my participation in 'illegal gathering', and not beaten or ill treated, while in the police station. They also threatened me not to go to any hospital or to be seen publicly because they were going to kill me instantly. They said they were going to do the same if I was not going to quit my affiliation and activities with the Democratic Party."

At the hearing before the immigration judge (or "IJ," as such hearing examiners are often called), Mr. Meçe pointed to his left shoulder when asked to clear up an inconsistency in the translator's rendition of his testimony about his "sinister bone" having been broken by the blow from the rifle butt. (The translator thought he heard Mr. Meçe say it was the right arm that was broken.) The IJ asked, at this juncture,

"So your left arm was broken? You pointed to your shoulder, sir. Was it your arm or your shoulder?"

Mr. Meçe's response, as rendered by the translator, was as follows:

"It's the bone, but links to the shoulder. If you see, you can notice yourself, I mean, in person. So if somebody sees it, it can be seen."

At this point, with the permission of the immigration judge, Mr. Meçe removed his shirt so that the IJ could see for himself where the injury had been inflicted. The IJ then stated, for the record, "He's showing me his chest and there's a bone that sticks out on his left side."

When Mr. Meçe got home from the police station, he testified, the pain was unbearable. Afraid that he would be killed if he went to a local hospital, he had his father take him by taxi to a hospital in the city of Korçë, some 45 kilometers away. Mrs. Meçe testified that she went too.

Mr. Meçe was hospitalized in Korçë on November 10, 2000, according to a "forensic report" that was received in evidence. The doctors who signed the document reported that the patient had sustained what they referred to as "Fractura Scapulae Humeral Sinister."[2]

Mr. Meçe testified that he was told he should stay in the hospital for a week, but he was fearful of doing so; he felt obliged to leave, he said, once he had been treated. The treatment included the application of a plaster cast at the shoulder, according to Meçe's declaration.

Afraid to go back to Erseka, Mr. Meçe and his wife went from Korçë to the town of Fushe-Kruja. There they stayed with Mrs. Meçe's parents, according to their testimony, remaining in hiding at the parents' house for a period of several months.

Eventually, Mr. Meçe testified, a cousin of his wife introduced them to some people who assisted them in leaving the country. In April of 2001 the Meçes traveled first to Greece and then to Canada.

Prior to their departure, the record shows, the Meçes were not living openly in Fushe-Kruja. Except for a brief visit to Tirana to make arrangements for the trip, Mr. Meçe testified that he did not go out of his in-laws' house. Mrs. Meçe confirmed that they did not leave the house, adding that they never even went to see Mr. Meçe's parents. Mrs. Meçe explained that when people came to the house, she and her husband would hide in the bedroom. The police kept asking about her, she said, but "my mother would tell that I don't know where my daughter is." The police never searched the house.

Responding to a series of questions posed by the immigration judge, Mrs. Meçe testified that she and her husband took no telephone calls while they were in hiding; that only her mother answered the phone when it rang; and that it was not necessary for them to place telephone calls to the cousin, because he would come to the house. It was through contacts of the cousin, as we have said, that the Meçes' departure from Albania was arranged.

After five days in Toronto, Mr. Meçe testified, he hopped a freight train that took him through a tunnel from Windsor, Ontario, to the United States. Mr. Meçe did not take his wife with him because he did not know if she would be physically capable of getting on and off the train while it was moving. Once he had made the trip himself, he concluded that it would not be too difficult for his wife to follow suit. The man who guided Mr. Meçe across the border had disappeared, however, and was not available to assist Mrs. Meçe; she remained in Canada for some four months before joining Mr. Meçe in this country.

Back in Albania, meanwhile, Mr. Meçe's father found it prudent to leave Erseka and move to Tirana. In the larger city, Mimi Meçe testified, "the possibility of maltreatment from the Socialists is slightly smaller."

In attempting to document his asylum claim, petitioner Meçe asked his father to obtain a card evidencing the younger man's membership in the association sometimes called the "Association of Anti-Communist and Politically Persecuted People." (Petitioner Meçe often referred to the organization as "the Association of Former Politically Persecuted.") Meçe the elder went to the association's office in Tirana and obtained a membership card for his son. The card, Albanian and

---

[2]The person who translated the report into English evidently had difficulty with the doctor's handwriting and misread "Scapulae" as "Icapulae." If one examines the handwritten original, a copy of which may be found at page 312 of the Joint Appendix, one can see that the word in question begins with the same initial letter as that with which the word "sinister" begins. The doctor was clearly reporting that the fracture was of the sinister humeral scapula.

English versions of which were received in evidence, showed that it was issued to Mimi Meçe by the Tirana branch of the association — a fact to which we shall return later in this opinion.

The U.S. government agency then known as the Immigration and Naturalization Service instituted removal proceedings against the Meçes following their arrival in this country. Conceding removability, the couple applied for asylum. An evidentiary hearing on the merits of the application was held before the immigration judge in September of 2002. The Meçes testified along the lines described above, and Mr. Meçe expressed the opinion that if he were to return to Albania, "the security agents[,] in collaboration with other people paid by them, will kill me."

A month after the hearing the immigration judge rendered an oral decision — tape recorded in advance and subsequently transcribed, corrected by hand, and signed by the IJ — in which he denied asylum and ordered that the Meçes be removed to Albania or, in the alternative, to Canada. In a one-paragraph per curiam order, the Board of Immigration Appeals dismissed an administrative appeal. The present petition followed.

## II

The immigration judge's denial of asylum rested on three broad findings:

1. Petitioner Mimi Meçe was not a credible witness. According to the IJ, in other words, the petitioner's story about his political activities having resulted in repeated arrests, beatings, and death threats by the authorities was simply unworthy of belief.

2. "[E]ven if you believe his story," the IJ continued, "the Court [*i.e.*, the immigration judge] finds that he has not suffered any past persecution; hence, he's not entitled [to] a presumption of future persecution."[3]

3. "[E]ven if you assume, *arguendo*, that it has happened and that it is past persecution, the [petitioner], by his own actions, demonstrated he can live several hours away from his home village with his in-laws for a period of five months immediately preceding leaving for Canada, and he was able to live there successfully and in peace. Hence, [petitioner], by his own testimony, showed that he could avoid future persecution by locating to another part of his country where it would be reasonable to expect him to do so."[4]

The order in which the Board dismissed the Meçes' administrative appeal did not address the second and third branches of the IJ's decision. Focusing solely on the credibility issue, the Board expressed itself as follows:

---

[3] An applicant for asylum must demonstrate that he is a "refugee" within the meaning of that term as defined in 8 U.S.C. § 1101(a)(42). The term covers, among others, "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself of or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . political opinion . . . ." *Id.* The implementing regulations make it clear that "[t]he applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(b).

[4] Under 8 C.F.R. § 208.13(b)(1), subject to a prescribed exception, "an immigration judge in the exercise of his or her discretion shall deny the asylum application of an alien found to be a refugee on the basis of past persecution if

\* \* \*

(B) The applicant could avoid future persecution by relocating to another part of the applicant's country . . . and under all the circumstances, it would be reasonable to expect the applicant to do so."

"The immigration judge made an adverse credibility finding, noting numerous occasions where the lead [petitioner's] testimony was inconsistent with [his] application, his wife's testimony, evidence submitted by the [petitioners], and reports by the Department of State (I.J. at 7, 10-11, 13-14, 16-17, 20-21, 24-25, 27-28, 31-32). The inconsistencies and deficiencies are supported by the record. [Footnote regarding the Board's "clearly erroneous" standard of review omitted.] Accordingly, the appeal is dismissed."

The Board's failure to find clear error in the immigration judge's adverse credibility determination leaves us, we are frank to say, more than a little puzzled. For reasons to which we now turn, we are satisfied that the alleged "inconsistencies and deficiencies" in petitioner Mimi Meçe's case, to the extent that any such inconsistencies and deficiencies may actually exist, come nowhere close to supporting the conclusion that the substance of the claim of persecution is false. The evidence, as we see it, "not only supports a contrary conclusion, but indeed *compels* it." See *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (quoting *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). *Cf. Mikhailevitch v. I.N.S.*, 146 F.3d 384, 388 (6th Cir. 1998).

III

At page 7 of the transcript of his decision (the first page cited in the Board's per curiam order), the immigration judge stated that "the [petitioner] has not demonstrated to be a credible person for the reasons stated below." Three reasons were offered by the IJ in the next set of pages (10 and 11) cited by the Board. The IJ expressed the first of these reasons thus: "[H]is testimony is inconsistent when, to some extent, at least with one of the events of significant fashion, which he claims was an impossible way to be inconsistent, this will be address[ed] below."

The attentive reader may find this description of the purported inconsistency somewhat opaque, but the immigration judge clarified the point at page 20, another page cited by the Board. There the IJ presented the following description of what the written asylum application says about the events of mid-January, 1998:

"He then indicates on the second day of the hunger strike, S[i]gurimi agents rushed to the plaza and furiously beat the crowd, and spraying us with pepper and handcuffing, and carrying away many people including him, and how he was punched in the face several times for participating in the demonstration. Of course, he also indicates he was beaten with rubber sticks, grabbed his hands, handcuffed him, and thrown in a police van."

The alleged inconsistency with the oral testimony is explained thus (still at page 20):

"He then continues talking for a lengthy paragraph [in the written application] about what happened at the police station. Never once does he mention that while he was being held there, basically overnight, that he was beaten while in the police station. In his direct examination, he claimed that he was placed in a cell and beaten. On cross-examination, he was asked, why it was not in his application that he was beaten in a cell; he said, well, you know, maybe I made a mistake or I did make a mistake, it was not really a cell that I was beaten, it was the police station. But then the Court pointed out to him the application doesn't even say you were beaten in the police station at all; then he said, that's impossible, it has to be in the application, but, of course, despite the fact that he had gone over the application earlier, submitted it twice to the Court; once, through the Asylum Office and, once through his counsel, it wasn't there. This raises a very, very serious concern on the Court's mind about [petitioner's] credibility."

Although the written application's description of each of the other episodes in the Erseka police station refers to beatings administered inside the station, and although the application's account of the January 1998 episode says that the police beat Mr. Meçe at the demonstration and punched him repeatedly in the face on the way to the police station, it is true that the declaration does not say, as Mr. Meçe explicitly said in his oral testimony, that "they beat me up" in the station. It is not true, however, that the omission of these four words constitutes an "inconsistency." What it is, of course, is an omission — and there is a difference. See *Liti v. Gonzales*, __ F.3d __, __ (6th Cir. 2005) [2005 WL 1384089 at *34]; *cf. Nwakanma v. Gonzales,* 126 Fed.Appx. 699, 701 (6th Cir. 2005) (unpublished) ("[s]uch a failure may be an omission, but it is not an inconsistency").

Although an omission can sometimes be significant enough to support an adverse credibility determination, "an asylum applicant is not required to provide an exhaustive, detailed list of all incidents of persecution in the asylum application." *Vasha v. Gonzales*, 410 F.3d 863, 871 n.4 (6th Cir. 2005). In the case at bar, it seems to us, the failure to mention one beating among many is of little consequence. Mr. Meçe's oral testimony that he was beaten up at the police station in mid-January expands on the written application but does not contradict it in any way. And the fact that the application was incomplete as to this detail hardly warrants an inference that the numerous affirmative statements in the application are untrue.

Turning to the next reason given for the adverse credibility determination, we observe that the immigration judge appears to have been offended that Mr. Meçe "actually came out in his application and said that [the Socialists who took over in 1997] were Communist or Neo-Communist." (Page 4 of the decision.) Mr. Meçe's assertion that the new government "was no different than the one he left," the IJ said, was "quite contrary to all know[n] country conditions . . . ." (Page 11, also cited in the Board's per curiam order.)

It is true that the U.S. State Department's 2001 "country conditions" profile on Albania (cited in note 1, supra) rejects the premise that a reconstituted Communist regime had come to power. But the fact that there is a difference of opinion between Mr. Meçe and the State Department over the political coloration of the Socialist government hardly means that Erseka police officers did not treat Mr. Meçe as he says they treated him and for the reasons he said they did.

Mr. Meçe's statements on this score are entirely consistent with the chapter on Albania in the U.S. State Department's 2001 "Country Reports on Human Rights Practices," a separate document that refers repeatedly to "human rights abuses" by the Albanian police and that cites the government's "poor" human rights record in many areas. "The police often beat suspects in the process of arresting them," the country report says. And after stating that "[p]olice beat and otherwise abused suspects, detainees and prisoners," the report specifically notes that "[t]he DP [Democratic Party] credibly reported some incidents of police harassment of its members . . . ."

The police harassment described by Mr. Meçe in his account of the events of November, 2000, took a particularly vicious form, of course — and we cannot see that it matters much just where in the political spectrum one chooses to place the police officers who, because of Mr. Meçe's activities on behalf of the Democratic Party, repeatedly hit him in the head (at least once with a pistol), kicked him, beat him on the soles of his feet until they were black, and broke his shoulder with a blow from the butt of a rifle. The jackboot, the rubber truncheon and the rifle butt can be equally painful, we should imagine, whether employed by "Neo-Communists" bent on silencing their political opponents or "Socialists" acting with the same objective. The poor soul on the

receiving end can be pardoned, perhaps, if he has difficultly distinguishing one brand of oppressor from the other.[5]

The last of the three reasons given by the immigration judge at pages 10-11 for finding Mr. Meçe not to be credible is this: "[H]is wife, in her testimony, completely torpedoed [petitioner Mimi Meçe's] credibility by explaining what happened while they were in hiding." Amplifying this point on page 13 — the next page cited by the Board — the immigration judge acknowledged that "his wife testified [as did Mr. Meçe] that they . . . stayed in the house for five months and didn't go anywhere except to make the arrangements to travel to the United States through a cousin of hers." But, the IJ observed, "the wife also went on and said that there were no incoming or outgoing phone calls, *no incoming or outgoing visitors*, other than to make the arrangements for the trip, and, yet, [petitioner], in his own application, indicated that he had secret contacts with members of the organization that he belonged to. Hence, she torpedoed his story and made the chance of winning virtually an impossibility." (Emphasis supplied.)

The IJ returned to this theme at two more pages cited by the Board, pages 20 and 21:

> "As mentioned above, the [petitioner] indicated that ultimately after the last discrete incident, he went into hiding at his mother-in-law's, which she also shared apparently with the father-in-law in a village a couple or three hours away from his home village. In his application, he says, 'during my stay in Fushe-Kruja, I kept secretive contacts with my party friends and affiliates from the Kolonja Branch. They told me that the S[i]gurimi agents detained and tortured members of the Democratic Party for participating in meetings and gatherings that are partly organized after the municipal elections.'

> * * *

> "The wife testified that they were always together. In fact, they basically spent the whole time in the living [room], never went outside, same as his story. Didn't make any phone calls, received no incoming phone calls, and if he would have had some contact with somebody from the outside, other than what was already divulged, she would know about, but *she doesn't know about any of these other matters*. Hence, this contact with the outside world and the Democratic Party, and knowing about S[i]gurimi agents detaining and torturing members is flat out not true, and this completely torpedoes [petitioner's] credibility." (Emphasis supplied.)

The immigration judge was mistaken in thinking that Mrs. Meçe had testified that "she doesn't know about any of these other matters." There was no such testimony. The immigration judge was also mistaken in thinking that Mrs. Meçe had testified that there were "no incoming or

---

[5]The State Department's 2001 "Profile of Asylum Claims and Country Conditions" is much more sympathetic to the Socialists, it is fair to say, than the State Department's 2001 "Country Reports on Human Rights Practices." The former document opines that "[w]ith the Socialist Party currently leading a coalition government, it is highly unlikely in today's circumstances that many applicants will have credible claims to political persecution." Indeed, the document asserts, "[t]here is virtually no evidence that individuals are targeted for mistreatment on political grounds."

One wonders whether the writer of these words had conducted any research in the Erseka police station. Perhaps the writer would find it informative to read the administrative record compiled in the case at bar and to inspect Mr. Meçe's left shoulder — where, as the immigration judge observed, there is a bone that now "sticks out." In any event, speculation and broad political generalizations by the State Department cannot trump concrete, detailed, and adequately corroborated evidence of specific instances of persecution. See *Zheng v. Ashcroft*, 397 F.3d 1139, 1143 (9th Cir. 2005); *Bace v. Ashcroft*, 352 F.3d 1133, 1139 (7th Cir. 2003).

outgoing visitors." On the contrary, Mrs. Meçe specifically referred to occasions on which "people would come to visit."

When people came to the house, as we have seen, Mrs. Meçe and her husband would hide in the bedroom. Surely it cannot be inferred from this that friends who were recognized as such by Mrs. Meçe's mother or father would be denied admittance to the house. There was no testimony that friends were sent away, and it seems highly unlikely that they were.

Mr. Meçe made it clear, in his testimony, that "my trusted people" knew where the couple were hiding. The logical inference is that when these "trusted people" came to visit, they visited the petitioners *inside the house*. It is true that Mrs. Meçe responded in the negative when asked if there was contact with anyone "on the outside," but Mrs. Meçe evidently understood the question to refer to contacts *outside the house*.[6] She was quite explicit, after all, about her cousin coming to the home — which was why, she explained, they never had to call on the phone. The Meçes talked with the cousin face-to-face inside the house, in short, and it would be unreasonable to conclude that they did not also talk with other trusted friends face-to-face inside the house.

The suggestion that Mrs. Meçe's testimony "completely torpedoes" the credibility of Mr. Meçe, thereby making it a virtual "impossibility" that the Meçes might prevail in the asylum proceeding, raises some concern in this court's mind about the immigration judge's objectivity. In the first place, as reasonably close analysis of the evidence shows, any conflict in the couple's testimony is more apparent than real. In the second place, it is far from self-evident that a true conflict would have been fatal to the asylum claim even if there had been such a conflict. "[M]inor and irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination." *Sylla v. I.N.S.*, 388 F.3d 924, 926 (6th Cir. 2004).

Suppose that, contrary to the evidence he presented, Mr. Meçe had never visited with trusted friends while in hiding and had never been told that other members of the Democratic Party were being detained and maltreated. Would this mean that Meçe himself had not been detained and maltreated? Or suppose that Mrs. Meçe had denied, untruthfully, that Mr. Meçe ever visited with trusted friends while in hiding. Would this mean that he had not been detained and maltreated? Obviously not. Standing alone, moreover, neither contingency would have been sufficiently significant to warrant a rejection of the petitioners' entire story on the logic underlying the familiar maxim "falsus in uno, falsus in omnibus."

In *Bibashani v. Ashcroft*, 124 Fed.Appx. 361 (6th Cir. 2005) (unpublished), a case arising out of facts not dissimilar to those presented here, we summarized the relevant law as follows:

> "'An adverse credibility finding must be based on issues that go to the heart of the applicant's claim.' *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). Findings of non-credibility cannot be based upon irrelevant inconsistencies in the evidence presented to an Immigration Judge. *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004). If presented discrepancies cannot be viewed as attempts by the applicant to enhance his claim of persecution, they have no bearing on credibility. *Id.* at 623 (citation and quotation omitted)." *Id.* at 365.

See also *Ahmed v. Gonzales*, 398 F.3d 722, 727 (6th Cir. 2005). Mr. Meçe's statement that he visited with trusted friends while in hiding does little to enhance his claim of persecution, and the supposed inconsistency with the testimony of Mrs. Meçe does not go to the heart of the applicants' claim. If there is a "torpedo" in Mrs. Meçe's testimony, the torpedo is obviously a dud.

---

[6]Mrs. Meçe also said, in reference to her husband, that "I don't know him to have contacted anybody;" this would obviously not rule out his friends contacting him by presenting themselves at the door of his in-laws' house.

Turning next to a page of the immigration judge's decision not cited by the Board (page 12), we note that the IJ took Mimi Meçe to task for "[having] the gall to tell the Court" that he was a member of the Association of Formerly Politically Persecuted Persons "despite the fact that," as the IJ put it, the membership card proffered in corroboration "contained a notation that he was a member of the Tirane branch and he lived nowhere near Tirane, and he'd even testified he didn't belong to that branch, and this is something he got from his father. Obviously, the father went out and got something that did not really apply to him."

The quibble about the card does little or nothing to bolster the adverse credibility determination. Obviously, as we have explained earlier in this opinion, the father went to the Tirana branch of the association and got a membership card for his son. We know this because the son so testified. The cover of the card bears the printed words "Branch of Tirana" following the name of the association. The body of the card — which contains a printed description of the association as a "national" organization — incorporates a printed form on which there are handwritten entries pertaining to Mimi Meçe. There is no reason that we can see to doubt the veracity of Mr. Meçe's explanation of what organization it was that issued the card and why the branch that did the issuing was not the branch to which he belonged. "I'm from Erseke," he testified, "and I belong to the Erseke branch." His father did not return to Erseka to get the card, but obtained it from the branch in the city where he was living at the time. "This is the same association," the petitioner testified — and the card's description of the association as "national" backs him up.

The immigration judge returned to the subject of the membership card at pages 22 and 23 of his decision, offering these further observations:

> "Next, at tab H, we have a membership card from the Association of Anti-Communist Democratic Persecuted People, Branch of Tirane, which gives his status in that organization as a letter D. [The petitioner] indicated that this was the same organization as was the Formerly Politically Persecuted Association and, yet, he could not explain away why the name was translated completely different and he could not explain that he had a status in the organization, so-called D. He said if he had a status in the organization, he'd certainly know about it. But he also testified that he obtained this document from his father. The court will note that there's nothing to corroborate this from the father. This document is not dated. Query, it adds more confusion to [petitioner's] claim than what it possible [sic] can solve."

The IJ's confusion may be insoluble, but it casts no serious doubt on the petitioner's credibility. Mr. Meçe testified that he was "simply a member" of the association and did not have any title in the organization. With respect to the letter "D" on the "status" line of the membership card, Mr. Meçe acknowledged that "I am not capable of telling precisely what is the A and what is the B, . . . what's C and D." Does this make the man a liar? We should not have thought so. If the card had been bogus, indeed, it is not unlikely that "Status D" would have been omitted or that Mr. Meçe would have been prepared with a story as to what this entry signified.

It is true that there is a typewritten document in the record that gives the name of the association as "SHOQATA I TË PERNDJEKURVE POLITIKË A ANTIKOMUNISTË DEMOKRATË" (translated as "Association of Former Political Persecuted and Anti-Communist Democrats"), while the printed membership form gives the name as "Shoquata Antikomuniste e të Përndjerkurve Demokratë." This is translated as "Association of Anti-Communist and Democratic Persecuted People." Mr. Meçe could not explain the slight variation in names, and he testified that it was the same organization. If that testimony detracts from his credibility, we confess ourselves at a loss to understand how or why. In any event, there can be no confusion about Mr. Meçe's membership in the Democratic Party of Albania.

Although there is more of this sort of nitpicking in the immigration judge's decision, we shall give only one further example. The first full paragraph on page 22 of the decision reads, in its entirety, as follows:

"Appended to Exhibit 3 are some documents that the Court will address. First, the Court notes that there's a forensic report that claims that it shows that [petitioner] suffered some very serious injuries after one of the discrete incidents. The Court will only note that even if this is a viable medical report, it doesn't say much that helps the Court. It claims that [petitioner] suffers from "fractura icapulae humeral sinister". Query, what that means in English? The Court doesn't know. In his application, of course, [petitioner] claims that he broke his sinister bone. Well, what's the sinister bone? In his testimony, he said he broke his arm, but he pointed to his clavicle."

If it be true that "[t]he Court doesn't know" what the medical report "means in English," it seems fair to ask why not. In context, surely, it should not have been difficult to deduce that "fractura" means fracture. "Icapulae" would have been more of a challenge if that had been what the doctor wrote, but it wasn't. (See n. 2, *supra*.) What the doctor wrote was "scapulae." In the lingua franca of the medical world, that is the possessive form of "scapula" — an English word which, according to Webster's Ninth New Collegiate Dictionary, is "called also '*shoulder blade*.'" And "humeral" means of or pertaining to the humerus, an English word which Webster's defines as "the long bone of the upper arm or forelimb extending from the shoulder to the elbow."

The answer to the question "what's the sinister bone" may also be found in Webster's. A bone is defined as "one of the hard parts of the skeleton of a vertebrate." The English word "sinister," in the sense in which it was obviously used here, is defined as "of, or relating to, or situated to the left or on the left side of something . . . ." So what the doctors at the hospital were saying was that Mr. Meçe had sustained a fracture of his shoulder bone at or near the point of articulation (or linkage, in the Albanian translator's terminology,) with the left upper arm bone.

That the immigration judge should not have been able to figure this out might strike the reader as curious, unless the IJ had no interest in figuring it out. But then, why should he? The IJ had seen the protruding bone with his own eyes, after all, and he hardly needed a doctor's report to tell him what part of Mr. Meçe's person had been injured.[7]

IV

The immigration judge asserted, with regard to Mr. Meçe's evidence, that "even if you believe his story" the maltreatment Mr. Meçe described would not rise to the level of "persecution." We do not find it strange that the Board should have refrained from endorsing this proposition. Mr. Meçe's account of the numerous beatings and death threats he received from the police on account of his political activities, culminating in the particularly sadistic punishment that sent him first to the hospital and then into hiding, impresses us as a classic example of what Congress must have had in mind when it chose the word "persecution." To say that what Mr. Meçe suffered was not "persecution" is to drain the word of any normal meaning.

---

[7]The immigration judge did say, to be sure, that Mr. Meçe "pointed to his clavicle." That may be so, but the clavicle (or collarbone) is located just above the scapula — and perhaps we may be forgiven for expressing some skepticism about the ability of the immigration judge to tell one bone from the other. In any event, the immigration judge clearly had good reason to know that Mr. Meçe, in the IJ's words, claimed to have " suffered some very serious injuries." As far as we can see, the IJ had no legitimate reason to doubt that Mr. Meçe had suffered those injuries at the hands of Albanian government agents within the walls of the Erseka police station.

Equally wide of the mark is the IJ's finding that, "by his own testimony, [the petitioner] showed that he could avoid future persecution by locating to another part of the country where it would be reasonable to expect him to do so." It would obviously not be reasonable to expect the Meçes to remain hidden in a house miles from their home, never venturing out of doors, never placing or answering telephone calls, never seeing anyone except trusted friends, and having to hide in a bedroom whenever someone knocked at the door. It is no wonder that the Board did not endorse this finding either.

V

The decision of the Board of Immigration Appeals is **VACATED**, and the case is **REMANDED** to the Board with instructions that it be assigned to a different immigration judge for further proceedings not inconsistent with this opinion.