NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0810n.06
Filed: October 4, 2005

No. 04-3043

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NIKOLIN VUCAJ, NORA VUCAJ, KLAUDIO VUCAJ, ANILA VUCAJ, | ) ) ) | |
| *Petitioners-Appellants*, | ) ) ) | ON APPEAL FROM THE BOARD OF IMMIGRATION APPEALS |
| v. | ) ) | |
| ALBERTO GONZALES, Attorney General, | ) ) | |
| *Respondent-Appellee*. | ) | OPINION |

BEFORE:     MOORE and COLE, Circuit Judges; and WISEMAN, District Judge.*

**R. GUY COLE, JR., Circuit Judge.**  This is an appeal from the Board of Immigration

Appeals' ("BIA") denial of petitioners' claims for asylum, withholding of removal, and withholding

of removal under the Convention Against Torture.  The petitioners also appeal the BIA's denial of

their motion to reinstate Nora Vucaj's separate asylum application, as well as the BIA's disposition

of their case by a single Board member.  For the reasons set forth below, we **GRANT** the petition

for review, **REVERSE** the BIA, and **REMAND** for proceedings consistent with this opinion.

## I.

### A.  Procedural Posture

---

*The Honorable Thomas A. Wiseman, Jr. United States District Judge for the Middle District
of Tennessee, sitting by designation.

The petitioners are Albanian citizens. The lead petitioner, Nikolin Vucaj, and his wife, Nora, were members of the Albanian Democratic Party. The Democratic Party is part of Albania's parliamentary government. The Democratic Party was often in opposition to the Socialist Party, the majority party in Albania. Nikolin was also a member of the Association of Formerly Politically Persecuted Persons, an Albanian non-profit organization whose members claim past persecution based on their political beliefs. It was Nikolin's membership in these two organizations that formed the basis for his application.

Nikolin entered the United States on May 29, 1997, and shortly thereafter he filed an application for asylum, withholding of removal, and withholding under the Convention Against Torture. Nikolin claimed that, if he returns to Albania, his life would be in danger because his political opinions are contrary to those of the Socialist Party. On August 27, 1997, Nikolin's asylum officer recommended approval of his asylum application.

Nora entered the United States with the petitioner's daughter, Anila, on or about June 8, 1998. The Immigration and Naturalization Service ("INS") (now part of the Department of Homeland Security) thereafter initiated removal proceedings against Nora and Anila. Nora filed a timely application, separate from Nikolin's, for asylum, withholding of removal, and withholding under the Convention Against Torture. Immigration Judge Robert Newberry set a hearing date on Nora's application for January 4, 2000, noting that Nora's hearing would become moot if her husband's asylum application were approved by that date, because Nora, as a dependent, would be granted any relief that her husband received. By January 4, however, Nikolin's application was still pending, and Nora was not ready to proceed on her own application. Therefore, Nora agreed to

withdraw her own application, with prejudice, in exchange for having her removal delayed so that she and her daughter could proceed under Nikolin's application.

In addition to Nora and Anila, Nikolin's application included their son, Klaudio. However, while the INS was processing this application, it determined that Nikolin had previously been stopped and fingerprinted by immigration officials.[1] This discovery was enough to halt the processing of Nikolin's application, and for the INS to commence removal proceedings against Nikolin, Nora, Anila, and Klaudio.

The Vucaj family then appeared, with new counsel, before the immigration judge on September 26, 2000. The new counsel requested that Nora, rather than Nikolin, be designated the "lead petitioner" because counsel believed that Nora had a strong case for approval. Counsel for the Vucaj family argued that even though Nora had previously agreed to dismiss her own application, she should nonetheless be allowed to proceed as the lead petitioner because her previous counsel had failed to obtain favorable relevant information from Nora for inclusion in her application. The crux of the previously undisclosed information was Nora's allegation that she had been sexually assaulted while she was imprisoned for three days in Albania. After some discussion, the immigration judge noted that he was inclined to find that Nora's new application was not properly before the court, but that he would reserve judgment on the matter until the hearing had concluded.

## B. The Vucaj Family's Factual Allegations

---

[1] While it is unclear from the record, it appears that this stop by immigration officials was tied to the fact that Nikolin had initially attempted to enter the country with a fraudulent passport. *See infra*.

What follows are petitioners' allegations of their past political persecution.

Nikolin testified that both his grandfather and uncle had been executed by the Albanian Army in the 1940s because of their opposition to the Communist regime. A few months before Nikolin was born, his father was arrested and never heard from again. In 1990, while the Communist Party's rule over Albania was quickly disintegrating, Nikolin and his brothers participated in a protest in Shkodra, Albania, where they lived. They attempted to tear down the bust of a former dictator and, along with over two-hundred protesters, were arrested by the police. Nikolin was immediately handcuffed and transported by truck to a police station. Once there, the police pushed him off the truck with such force that he fell and broke both of his wrists. Nikolin stated that, while in police custody, he received medical treatment for his wrists and then remained in jail for four weeks. He also claimed that he was beaten with electric wires during his time in prison.

After the fall of the Communist Party in Albania, the Democratic Party assumed power in 1992. However, in 1997, the Democratic Party was removed from power and replaced by the Socialist Party. Nikolin testified that he and his wife attended two demonstrations in opposition to the rule of Socialist Party. In 1997, Nikolin received two letters from unidentified sources, promising that he and his brothers would be "eliminated." Nikolin also learned from a friend that his name had been added to a Socialist Party blacklist and that people added to the blacklist were usually killed within a few days.

Nikolin first left Albania in April 1997. Nikolin attempted to enter the United States but was refused entry when his fraudulent passport was detected by immigration authorities. Nikolin

returned to Tirana, Albania and lived in hiding at a friend's house for a month before he was successful in entering the United States.

Nora testified that on March 8, 1998, she participated in a human rights demonstration that was held outside the Democratic Party headquarters in Shkodra. Though the demonstration itself was peaceful, two uniformed police officers and a third man in civilian attire came to her home later that night, grabbed her by the hair, and took her to a prison. For the next two days she was held in a small room and interrogated by police officers about her husband's whereabouts. Nora testified in great detail that on the third day, an Albanian official in plain clothes, violently raped her while her hands were tied. Nora stated that as a result of the rape, she had bruises on her body, particularly around her neck. That same day, Nora was released.

Nora explained that she told only her sister about the rape because she was ashamed and feared that her community would shun her. She did not tell her husband for the same reason. Nora also did not tell her first counsel about the rape because she was too ashamed for her interpreter—who was an Albanian male—to hear about these events, and she thought that the details of her three-day captivity were irrelevant to her application, as she had disclosed her captivity and mistreatment in general.

Nora further testified that on April 26, 1998, masked men attempted to kidnap Anila as she walked home alone from a class field trip. Though Nora admitted that she did not witness the attempted kidnapping, she recounted that her neighbors brought Anila home and told Nora about the incident. Nora believed that the kidnappers were members of the Socialist Party because of her prior encounter with the police and because she also received anonymous letters threatening her life.

At this point in the hearing, the judge asked Nora about the jewelry she was wearing. The judge questioned Nora extensively about whether the stone in her necklace was an opal, and why she wore two "very ostentatious" rings, one of which had "great big diamond." Joint Appendix ("JA") 500. The judge then commented that Nora was well-dressed and raised the possibility that the kidnappers were after Nora's money. Nora explained that they were a middle-class family in Albania and that she had bought her jewelry at a garage sale in the United States. Petitioners further note to this Court that they were under the impression that they should appear well-dressed at their hearing out of respect for the immigration court.

Anila, who was twelve years old at the time of the hearing, also testified before the immigration judge. Anila testified to the attempted kidnapping, which occurred when she was nine years old. Anila stated that while she was walking home from a class field trip, she saw a van with two masked men approach her. Anila said that when one of the men grabbed her arm, she screamed, attracting the attention of her neighbors who came to her aid. Anila also remembered when the police came to her home and took her mother away for three days. When her mother returned, Anila remembered that her mother's clothes were dirty and torn and that she had bruises on her face and neck.

A few days after the attempted kidnapping, Nora , Anila, and Klaudio moved in with Nora's uncle in Pjetroshan, Albania. The three stayed there for a few months until coming to the United States.

In addition to Anila, three of Nikolin's brothers, Kole, Dod, and Ndoc Vucaj, testified at the hearing. Kole testified that he protested alongside Nikolin in 1990 against the Socialist Party and

was arrested with him. Kole was not detained in the same cell as Nikolin but he testified that when

Nikolin returned home a month after having been arrested, both of his arms were in casts. Kole

testified that he saw, but did not read, the threatening letters that Nikolin received. Kole stated that

he fled to the United States after his wife and daughter were kidnapped. Dod testified that he visited

Nikolin when Nikolin had casts on both arms. Then Ndoc testified that he was also at the protest

in 1990 with Nikolin and Kole, but that he had not been arrested.

At the end of the hearing, the immigration judge denied the petitioners' application for

asylum and withholding of removal. The immigration judge concluded that the petitioners were not

credible, and alternatively, that the country conditions had changed such that the petitioners no

longer had a well-founded fear of future persecution in Albania. The judge also denied Nora's

motion to reinstate her independent application and include in it the allegations of sexual assault.

On appeal to the BIA, the case was reviewed and affirmed by a single member of the Board.

The single Board member issued a short opinion affirming the immigration judge's credibility

findings regarding Nikolin and the denial of Nora's motion to reinstate her application. The

petitioners timely appealed the BIA's decision. As our review is limited to the BIA's decision, we

will not address the immigration judge's alternate findings, such as his credibility findings with

respect to Nora or his findings regarding changed country conditions, as these findings were not

adopted by the BIA. *See Mece v. Gonzales*, 415 F.3d 562, 571 (6th Cir. 2005).

**II.**

**A. Nikolin's Asylum Application**

Our standard for reviewing the BIA's factual findings is deferential: factual findings are conclusive, unless we determine that the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992). Questions of law are, as usual, reviewed *de novo*. *Ashki v. INS*, 233 F.3d 913, 917 (6th Cir. 2000).

An applicant may obtain asylum under Section 208(a) of the Immigration and Nationality Act if he shows that he is a "refugee," meaning that he is unwilling or unable to return to his home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The applicant must establish, through substantial evidence, that he has both a subjective and objective fear of persecution. *Ivezaj v. I.N.S.*, 84 F.3d 215, 221 (6th Cir. 1996). If an applicant establishes past persecution, a presumption of future persecution arises under 8 C.F.R. § 208.13, which the Government may rebut by showing changed country conditions.

As to Nikolin's claims of past persecution, the immigration judge found that Nikolin was not credible based on certain inconsistencies and omissions. In reviewing credibility findings, we consider that:

> "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim." *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). Findings of non-credibility cannot be based upon irrelevant inconsistencies in the evidence presented to an Immigration Judge. *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004). If presented discrepancies cannot be viewed as attempts by the applicant to enhance his claim of persecution, they have no bearing on credibility. *Id.* at 623. (citation and quotation omitted).

*Mece*, 415 F.3d at 576 (quoting *Bibashani v. Ashcroft*, 124 Fed. Appx. 361, 365 (6th Cir. 2005) (unpublished)). "Like affirmative inconsistencies, omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005). Furthermore, "[w]hile an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Sylla*, 388 F.3d at 926. Therefore, our task is to review the adverse credibility findings that were adopted by the BIA and determine whether the underlying basis for these findings was sufficient.

The immigration judge noted several specific problems with Nikolin's testimony which contributed to the ultimate adverse credibility finding. Specifically, the judge found four inconsistencies or implausibilities. First, the BIA and immigration judge found it critical that the petitioners' asylum applications state that in 1990 Nikolin attended a protest with his brothers where the group tore down a statue of "Joseph Stalin," but when Nikolin testified, he said that the group tore down a statue of "Enver Hoxha," an Albanian dictator who was a successor to Stalin. Nikolin explained this inconsistency by saying that his wife must have confused the two dictators because in Albania, Hoxha is often referred to as the "son" of Stalin. Nikolin then said that he himself knew the difference between the two figures, however this inconsistency was found in his application as well as his wife's application. The Government emphasizes that the "devil is in the details" and that, therefore, an inconsistency of this minor nature indicates that the petitioners are untrustworthy. This is not the rule we follow for evaluating credibility determinations, nor it is a particularly useful rule for detecting the truth. Inconsistencies that do not relate to the basis of an applicant's alleged fear of persecution or that do not go to the heart of the applicant's asylum claim are plainly insufficient

to support an adverse credibility finding. *Daneshvar*, 355 F.3d at 623. While the name of the particular Communist dictator whose statue was torn down may be tangentially related to the applicants' claim, in that the name of the dictator and Nikolin's claim of persecution both involve the communist regime, we fail to see how this discrepancy can be "viewed as an attempt[] by the applicant to *enhance* his claim of persecution." *Id*. at 623 (emphasis added). It is not as if Nikolin changed the name of the dictator to coincide with the political party in power, or changed an act of mere vandalism of public property to a political crime. Instead, the essence of Nikolin's claim—that he attended a political protest with his brothers and helped tear down a statute of a Communist leader—remains untarnished. Accordingly, this "inconsistency" is not sufficient to support the adverse credibility finding here.

Second, the BIA and immigration judge found that Nikolin and Nora lacked credibility because when Nora left Albania she left her young son Klaudio behind, despite the fact that the petitioners claimed that the entire family was in danger. While certain activities by a petitioner may cause one legitimately to question his genuine fear of persecution, this is not one of them. Nora testified that she wanted to bring both Anila and Klaudio with her to the United States. However, her uncle, who had made the arrangements to get them out of Albania, was only able to secure passage for Nora and Anila. JA 509. Nora believed that it was important to get out of Albania as soon as possible, given the recent kidnapping attempt of Anila. She also believed that her alleged persecutors would have an easier time of identifying her family if she stayed at her uncle's home with both of her children, than if only Klaudio stayed with her uncle. JA 512. Nora further explained that her uncle was able to find safe passage for Klaudio a few months after Nora and Anila

arrived in the United States. While we can conceive of situations in which leaving a child behind would tend to discredit a petitioner's genuine fear of persecution—such as when there was no explanation for failing to bring the child and the child was independently a target—this is not that case. Here, petitioners temporarily left their son in safe hands, and they did so because there was an urgent need to leave the country. It is also clear throughout their testimony that it was Nikolin, Nora, and Anila, who had been the visible targets of the family. Accordingly, the fact that Nora left her son in Albania with her uncle for a few months does not support the adverse credibility finding; to the contrary, it bolsters Nora's claims.

Third, the BIA and immigration judge noted that there is no record that Nikolin told his initial asylum officer during his interview that he had received two threatening letters in early 1997 or that he heard that his name had been placed on a Socialist Party blacklist during that same time period. As an initial matter, Nikolin claims that he did in fact tell his asylum officer about these events, however the asylum officer did not include these events in his one-and-a-half page assessment of the interview. The officer did, however, note that Nikolin "presented testimony that was detailed and consistent thus he is deemed credible." JA 271. Regardless of whether Nikolin specifically told the asylum officer about the threatening letters and the blacklist, this omission does not support an adverse credibility finding here when one examines what Nikolin indisputably told the asylum officer. In Nikolin's first asylum application, which he filed immediately upon entering the United States, he wrote, in the limited space that was provided in the asylum application questionnaire, that the Albanian authorities "threatened me and my family . . . if I were to return, I would pay the price with my life." JA 126. He noted again in another answer that Albanian

authorities "have detained, beaten, tortured and *threatened* with death all my family on several occasions." JA 127 (emphasis added). Likewise, Nora noted in three separate places on her initial asylum application that she and her husband had been "threatened" by Albanian officials or the secret police. Accordingly, it is not as if the petitioners changed their story when they testified before the immigration judge. At best, they may be faulted with omitting details of the threats they received. "Although an omission can sometimes be significant enough to support an adverse credibility determination, 'an asylum application is not required to provide an exhaustive, detailed list of all incidents of persecution in the asylum application.'" *Mece*, 415 F.3d at 573 (quoting *Vasha v. Gonzales*, 410 F.3d 863, 871 n.4 (6th Cir. 2005)). In *Mece*, we found that where the petitioner had described incidents of being beaten by Albanian officials at a demonstration but omitted the fact that he had been beaten in the police station itself, such a failing was an insignificant omission. Similarly, the fact that Nikolin failed to detail the *form* in which the death threats were made in his initial asylum application does not provide a sufficient basis for an adverse credibility finding. This is particularly true because Nikolin noted the other, more significant, incidents of persecution—such as the fact that he was arrested, detained, and beaten by the police—and because he had consistently asserted that he had been threatened with death by those he believed to be government officials.

Finally, the BIA and immigration judge noted that it was implausible that Nikolin would have gone to the Shkodra police station to obtain his passport if he genuinely believed that the police were threatening his life. While such a conclusion would be reasonable had Nikolin claimed that he feared the Shkodra police officers, Nikolin made no such claim. Nikolin consistently maintained

that he believed a "Secret Police" group had sent him the threatening letters and had formed the Socialist Party blacklist. He explained that the former head of the "Criminalistic Department" under the Communist Regime had formed this governmental group, and it was this group and the people associated with it that he feared. JA 544-548. In fact, when Nikolin was asked why he went to the police station for his passport, he explained that many of the people who had worked at that particular police station had ties with the Democratic Party, and that therefore, he did not have any problem picking up his passport from that station. While one would not be compelled to believe Nikolin's assertions against other factual assertions, there were no counter assertions presented at the immigration hearing. Without such countering justifications, the immigration judge's adverse credibility finding in this regard was baseless.

In sum, we find that the adverse credibility findings adopted by the BIA are based on irrelevant inconsistencies and omissions which do not go to the heart of the petitioners' claims or are not supported with sufficient and specific reasons. Accordingly, the BIA's decision with respect to Nikolin's application is VACATED and REMANDED to the BIA.

**B. Nora's Motion to Reinstate her own Application**

We review the BIA's decision not to reopen or reinstate a petitioner's asylum application for an abuse of discretion. *INS v. Doherty*, 502 U.S. 314, 323 (1992) (motions to reopen); *Mendez-Gutierez v. Ashcroft*, 340 F.3d 865, 869 (9th Cir. 2003) (motions to reinstate an application are treated the same as motions to reopen an application).

Although Nora had previously agreed to dismiss her independent asylum application, she moved to reinstate her original application when her husband's asylum application was denied.

Nora argued that she only agreed to dismiss her application because it appeared, at the time, that Nikolin's application would be approved and she did not want to disclose unnecessarily her sexual assault. She also explained that she did not feel comfortable disclosing the sexual assault to her first counsel who used a male interpreter.

The immigration judge declined to reinstate Nora's application because by the time she made the request, her application was outside of the statutorily prescribed one-year filing period for asylum claims. 8 U.S.C. § 1158(b). The immigration judge determined that Nora had failed to show an extraordinary circumstance under 8 C.F.R. § 208.4(a)(5) which would permit consideration of her time-barred claims. The BIA affirmed this decision.

The BIA erred in analyzing this case under 8 U.S.C. § 1158(b), because this statutory provision relates to untimely filed asylum applications. In this case, however, Nora did not file an untimely asylum claim, but instead filed a motion to reinstate a previously filed timely application. Therefore, it was error for the immigration judge and the BIA to apply the "extraordinary circumstances" standard set forth under 8 C.F.R. § 208.4(a)(5) to Nora's situation. Instead, as the BIA itself has stated, when a petitioner moves to reinstate a timely filed asylum application, the BIA should examine whether the petitioner "has established a prima facie case of eligibility for asylum." *Mendez-Gutierez*, 340 F.3d at 870. Nora testified that she was taken to a prison hours after attending a political protest, and that during her incarceration, she was brutally raped by a prison official. She also testified that shortly thereafter she had received threats and that masked men attempted to kidnap her daughter. Her daughter testified as to the details of this attempted kidnapping. Accordingly, Nora has established a prima facie case of eligibility for asylum, as she has alleged

past persecution by Albanian officials. Nora and Anila's assertions clearly go beyond the type of "vague and general accusations of harassment" which would fail to establish a prima facie case for reinstatement. *Id*. At 868. While there may be other factors for the BIA to consider in evaluating a motion to reinstate a timely filed asylum application, *see id*. at 870 n.7, we conclude that the BIA abused its discretion here because it applied the wrong legal framework to Nora's appeal. Accordingly, the BIA's decision with respect to Nora's application is VACATED and REMANDED.

## C. BIA's Streamlining Process

In this case, a single BIA member affirmed the immigration judge with a short opinion pursuant to the BIA's authority to streamline cases under 8 C.F.R. § 1003.1(e)(5). On appeal, the petitioners argue that their case should not have been streamlined and affirmed without opinion.

First, we note that contrary to petitioners' argument, an opinion was issued by the BIA; however, it was issued by a single member rather than a three-member panel. Second, the streamlining regulations provide that cases "may only be assigned for review by a three-member panel" if there is a need to settle inconsistencies between immigration judges, to establish precedent or resolve a case of national import, or to review decisions that are not in conformity with the law or rely on clearly erroneous factual determinations. 8 C.F.R. § 1003.1(e)(6). We have previously upheld the streamlining regulations. *See Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003). Petitioners' only argument is that the immigration judge's decision was based on a "clearly erroneous factual determination," and therefore the case should have gone to a three-member panel

of the BIA for review. In light of our decision to remand both Nikolin and Nora's asylum applications for further proceedings, this issue is now moot.

### III.

For the preceding reasons, we **GRANT** the petition for review, **REVERSE** the BIA, and **REMAND** for proceedings consistent with this opinion. We encourage the BIA to assign this case to a new immigration judge. *See Mece*, 415 F.3d at 578; *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1055 n.4 (9th Cir. 2002); *Kim v. Ashcroft*, 95 Fed. Appx. 418, 425-26 (3rd Cir. 2004) (unpublished).