RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0109p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ABOUBECRINE N'DIOM,

       *Petitioner-Appellant,*

    *v.*

ALBERTO R. GONZALES, Attorney General of the
United States,

       *Respondent-Appellee.*

No. 04-3742

---

On Petition for Review of a Decision of the Board of Immigration Appeals.
No. A96 273 622.

Argued: February 3, 2006

Decided and Filed: March 24, 2006

Before: MERRITT, MARTIN, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** Svetlana J. Schreiber, SVETLANA, SCHRIEBER & ASSOCIATES, Cleveland, Ohio, for Petitioner. Rita Bryce, U.S. DEPARTMENT OF JUSTICE, Cleveland, Ohio, for Respondent.

MERRITT, J., delivered the opinion of the court. MARTIN, J. (pp. 8-9), delivered a separate concurring opinion. GILMAN, J. (pp. 10-13), delivered a separate dissenting opinion.

---

**OPINION**

---

MERRITT, Circuit Judge. In this asylum case of the petitioner N'Diom, we review the May 4, 2004, decision of the Board of Immigration Appeals of the U.S. Department of Justice found at Joint Appendix ("J.A.") at 8-9. As in so many such cases now coming before us, the Board's decision affirms the August 29, 2003, decision of the Immigration Judge finding N'Diom's testimony at the hearing to be "not credible" (J.A. at 16-27) based entirely on the fact that N'Diom's testimony before the Judge was much more detailed and specific as to the basis for his fear of persecution than the information he gave the Asylum Officer at the time he initially applied for asylum. (*See* J.A. at 165-66, 197.)

The pertinent statutory basis and standard of review for our remand action in this case is set out in *INS v. Ventura*, 537 U.S. 12, 13, 16 (2002) (per curiam):

Federal statutes authorize the Attorney General, in his discretion, to grant asylum to an alien who demonstrates "persecution or a well-founded fear of persecution on account of . . . [a] political opinion," and they require the Attorney General to withhold deportation where the alien's "life or freedom would be threatened" for that reason. Immigration and Nationality Act, §§ 101(a)(42)(A), 208(a), 243(h), 66 Stat. 166, as amended, 8 U.S.C. §§ 1101(a)(42), 1158(a), 1253(h)(1) (1994 ed. and Supp. V).

. . . .

No one disputes the basic legal principles that govern remand. Within broad limits the law entrusts the agency to make the basic asylum eligibility decision here in question. *E.g.*, 8 U.S.C. § 1158(a); 8 U.S.C. § 1253(h)(1) (1994 ed.); *Elias-Zacarias*, *supra*, at 481, 112 S. Ct. 812; *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999). *See also* 8 CFR § 3.1 (2002). In such circumstances a "judicial judgment cannot be made to do service for an administrative judgment." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). Nor can an "appellate court . . . intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Ibid*. A court of appeals "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Rather, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Ibid*. Cf. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (describing the reasons for remand).

That is the procedure we are following in this case.

## I.

N'Diom is a native and citizen of the West African Islamic Republic of Mauritania, a country of approximately three million people. His ethnic minority group, the black African "Fulani," comes from the southeastern part of the country, and Senegal to the south. The State Department's "Country Reports on Human Rights Practices" of February 25, 2004 (J.A. at 151-64), states that "successive governments — both civil and military — have pursued various policies of 'Arabization'" that involve discrimination, imprisonment and torture of members of ethnic minorities like the Fulani and also that slavery of black Africans still persists in some areas. (J.A. at 161, 163.) The same Report states that the government's "human rights record remained poor," "unlawful killings by security forces" were reported, "the security forces reportedly used excessive force, beat, or otherwise abused detainees," "restricted freedom of speech, the press and assembly . . . and religion," discriminated against "southern-based ethnic groups," and "international reports continued that slavery in the form of involuntary servitude persisted." (J.A. at 151-52.) Press reports after the State Department country report in 2004 state that a military coup occurred August 3, 2005. *See* Wikipedia, Mauritania, *at* http://en.wikipedia.org/wiki/Mauritania (last visited Jan. 17, 2006); U.S. Dep't of State, Background Note: Mauritania, *at* http://www.state.gov/r/pa/ei/bgn/5467.htm#govtnote (last visited Jan. 17, 2006). How those events have now affected country conditions remains unclear.

At the trial the Immigration Judge ruled inadmissible documents and witness testimony proffered by N'Diom because they were not submitted ten days in advance under local rules, and so the Judge ruled that, "Thus the . . . case depended upon his testimony." (J.A. at 18.) The Judge summarized as follows the testimony pointing to six "discrepancies" that led him to reject N'Diom's testimony. No "discrepancies" were found in his recital of the torture he received. All of the so-

called "discrepancies" are simply omissions to state a particular detail.  None are lies in the sense of a statement opposite to or inconsistent with a prior statement:

**Discrepancy 1**                The respondent testified that he was a Fulani, native and citizen of Mauritania, who went to Libya to obtain an education at the expense of the government of Mauritania.  He testified that, when the Mauritanian government began to deport Fulani and other black citizens from Mauritania to Senegal and to Mali, the respondent protested and may have even formed an organization.   The activities of the respondent came to the attention of the Mauritanian ambassador to Libya who summoned him to the embassy and told him to stop these activities.  The respondent refused.    Shortly thereafter, the government of Libya took the respondent into custody.  In the personal statement found at Exhibit 6, the respondent described being psychologically and physically tortured by the Libyan government for his purported hatred of Arabs.  The respondent testified today that the Libyan government only psychologically tortured him, *but this is the first in a number of discrepancies* which the Court will comment on during the course of this decision.

The respondent testified that he returned to Mauritania under compulsion and was taken into custody upon arriving at the airport and was then taken to a police station.  The respondent testified that he was slapped by officers of the Mauritanian government and accused of being a member of FLAM, and that he wrote "lots of things against the law in the Fulani language."  The respondent testified that when he asked what it was that he wrote he was told that he would learn soon enough and the respondent testified that over the course of time he was tortured, including having electrodes applied to his genital parts and also being put into the jaguar position, which the Court understands from previous cases to involve basically trussing a human being and holding him upside down.

The respondent testified that he wrote songs, poetry, and plays in Fulani, but they were not published.  He said that these songs, plays, and poetry were known to the authorities in Mauritania and, at the request of the Court, he recited a few lines of one song called Unity of Mauritania in which he lauded the importance of all Mauritanian citizens to act in unity.

**Discrepancy 2**                The respondent testified that he was five months in jail and then moved from the jail at the

Fourth District of Nouakchott to a jail called Hundred Meter Jail, referring to the size of a typical cell apparently. The respondent testified that the Hundred Meter Jail was a particularly bad jail and that this was a situation where he was required to live basically underground and he was either in darkness or had bright lights shown upon him. The respondent testified that he is required to wear eye glasses as a result of that, but he does not have a letter from a physician explaining how the injuries which he said he has suffered were caused. **[Discrepancy 2.]** That is, the respondent has not presented any objective evidence concerning the necessity for him to wear glasses.

**Discrepancy 3**    The application for asylum states that the respondent was released in March 1993 and then is silent until a fear that the respondent following the break up of the UFD Political Party [sic]. This is to be contrasted with the testimony he offered today which was that after he was released from custody in 1993 he was held in a kind of house arrest between 1993 and 1997 and 1998. **[Discrepancy 3]** The respondent testified that he was living in the home of his cousin who has submitted documents in support of his application, *see* Exhibits 5-H and 5-I.

**Discrepancy 4**    The respondent testified that he was required to report to a police station in Nouakchott every Monday and he was not allowed to leave the city. This does not appear in his I-589.

**Discrepancy 5**    The Government, on cross-examination, introduced notes of the asylum officer at Exhibit 8 and the Assessment to Refer at Exhibit 9. Apparently, before the asylum officer he told about being required to report, but did not say anything about the second arrest which he testified about today.

**Discrepancy 6**    The respondent testified that on October 12, 1998 officers came to the house and picked the respondent up. He stated today that this so shocked his then wife, who was pregnant, that she ultimately died and this does not appear in the I-589 nor was it related to the asylum officer. Indeed, the handwritten notes of the officer, at page 6, indicate that the officer asked the respondent if anything had happened to him after his release in 1993. The respondent replied to the officer that nothing happened except that he was required to report and that he felt harassed by being required to report on such a regular basis.

(J.A. at 18-21.) (Emphasis added.)   The Judge summarized his ruling in conclusory fashion, as follows:

> To recapitulate, the I-589 contains no testimony about an arrest in 1998 or an earlier house arrest.  The I-589 says nothing about the respondent being required to report every Monday during his earlier arrest nor does it say anything about his wife dying of shock following an arrest of the respondent in 1998 and his being jailed for one month.
>
> . . . .
>
> The asylum officer has no reason to be incomplete in his or report [sic].  The Court finds that the Assessment to Refer is a reliable document and does rely on it, making negative credibility determinations against the respondent.
>
> Because of the confused nature of this record, especially as it relates to the various stories that the respondent has told before the tribunals of the United States Government, the Court cannot conclude that the respondent has offered credible testimony today.

(J.A. at 25-26.)   The reason that N'Diom was unable to introduce any witness or documentary evidence corroborating his testimony was that his immigration lawyer at the trial did not understand or comply with the local ten-day rule requiring advance submission.  The Judge commented several times on counsel's violations of the local rules, his ineffectiveness in conducting examination of N'Diom, and the incompetence of his office in preparing for the trial.

## II.

We believe this case needs to be remanded for further consideration in a full and fair hearing with the counsel N'Diom has now obtained on appeal or other competent counsel.  In light of the recent coup, the earlier 2004 human rights conditions reported for Mauritania, and the hostile treatment by government security forces of members of the Fulani minority, retrial of N'Diom's claim is necessary.  There is no indication in the record before us that the Immigration Judge or the Board took cognizance of the dire human rights situation in Mauritania or the mistreatment of the black African Fulani by the government.  If the country reports that explain the torture, slavery, and other human rights violations are unimportant or irrelevant to this case, we would like to have some explanation of the Board's views on this subject.  *See, e.g., Mostafa v. Ashcroft*, 395 F.3d 622, 625-26 (6th Cir. 2005) (remanding where the Board's opinion "contains absolutely no discussion of the country conditions in Iran" and "never mention[s]" the State Department reports included in the record); *Zubeda v. Ashcroft*, 333 F.3d 463, 477-78 (3d Cir. 2003) (remanding where the Board's opinion "totally ignores . . . reports from government agencies and human rights organizations that detail what appear to be country wide, systematic incidents of gang rape, mutilation, and mass murder"); *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001) (remanding where "nowhere in its opinion did the BIA consider the documented country conditions in Sri Lanka which corroborate the widespread practice of torture against Tamil males"); *Mansour v. INS*, 230 F.3d 902, 908-09 (7th Cir. 2000) (remanding where the Board's opinion failed to discuss a State Department report detailing country conditions in Iraq, and observing that "had the BIA addressed the Report it might have viewed [the applicant's] torture claim differently").

The Judge and the Board of Immigration Appeals did not find much of N'Diom's testimony lacking in credibility.  In broken English N'Diom explained that a translator wrote his original asylum petition and had left out details and that the asylum officer had cautioned him to "keep it

short."  Neither the Immigration Judge nor the Board explains why they disbelieve this explanation for the earlier omission of details covering his wife's death and the persecution he suffered upon his arrival back in Mauritania after his initial period of imprisonment and torture.  *See, e.g., Zheng v. Gonzales*, 154 Fed. Appx. 240, 241 (2d Cir. 2005) (unpublished) (remanding where the Immigration Judge "did not specifically address" the applicant's proffered explanations for inconsistencies nor state his reasons for finding the explanations to be "not reasonable" and "not rational"); *Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004) ("An adverse credibility finding is not based on substantial evidence when '[t]he BIA [or the IJ] did not comment on [an applicant's] explanation, nor suggest any reason that it found his explanation not credible'."); *Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999) (noting that the BIA is required to "address in a reasoned manner the explanations that [the applicant] offers for these perceived inconsistencies").

In addition, the record discloses that N'Diom's counsel was clearly lacking in competence and diligence, as the Immigration Judge noted several times.  (J.A. at 17, 23-24.)  As a result, witness testimony and documentary evidence purporting to explain why N'Diom's alleged fear of persecution was genuine and legitimate were excluded.  Had the Board considered this evidence relevant to his fear of persecution in Mauritania, it might have adjudicated N'Diom's claim differently.

N'Diom may or may not have a meritorious claim for asylum.  We cannot, however, conduct a meaningful review where the Board does not sufficiently articulate its reasoning nor evaluate the applicant's claim "on the record considered as a whole."  *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).  We understand that immigration officials and judges are hard pressed by case overload.  We sympathize.  Federal appellate judges are confronted by the same problem.  Nevertheless, the policy of our asylum law is not to deport aliens who have a justified fear of returning to their native country.  The combination of (1) a coup in Mauritania and uncertainty about present conditions, (2) incompetent counsel, and (3) questionable rejection of N'Diom's testimony — testimony that seems plausible and consistent with known facts about conditions in Mauritania — leads us to vacate the decision of the Board of Immigration Appeals and remand the case for retrial of the question of N'Diom's eligibility for asylum.  If the Board still believes after retrial that N'Diom is lying, a more detailed explanation of its reasons for disbelieving the testimony is necessary.  Does the administrative agency disbelieve his testimony concerning his arrest in Lybia, his testimony of torture upon returning to Mauritania, and his imminent arrest just before he left the country?  If so, what facts are its contrary findings based on?  *See, e.g., Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004) (noting that an adverse credibility finding "must be supported by specific reasons"); *Gao v. Ashcroft*, 299 F.3d 266, 276 (3d Cir. 2002) (Adverse credibility findings must be "supported by specific cogent reasons.  The reasons must be substantial and bear a legitimate nexus to the finding.").[1]

---

[1]Our dissenting colleague does not understand that a court of appeals in reviewing the BIA in an asylum case may simply reverse because it definitely concludes that the BIA is wrong or alternatively may remand for further consideration when we find that the administrative proceedings leave us in substantial doubt as to the correctness of the proceedings as a whole and the justice of the result.  *See INS v. Ventura, supra*, and the cases cited above in Section II.

In addition, the dissenting opinion takes issue with our view of the (1) agency's conclusion based on credibility findings, (2) the clear incompetence of counsel, and (3) the failure of the agency to discuss intelligently the country conditions that appear to support N'Diom's claim.  These three problems together create the need for the remand.  The dissent may or may not be correct that each problem standing alone and in isolation from the others may not justify a remand, but taking all three of these factors together we believe reconsideration is necessary in order to be confident that a serious mistake is not taking place here.  The law is not as rigid and isolated from the real world as our dissenting colleague would lead us to believe.  Administrative review requires a hard look at all of the factors taken together, not simply a narrow focus that treats each as though it were the only problem in the case.

Accordingly, the decision of the Board of Immigration Appeals is vacated and the case is hereby remanded to the Board for further consideration in light of this opinion.

---

**CONCURRENCE**

---

BOYCE F. MARTIN, JR., Circuit Judge, concurring.  At the base of the Statue of Liberty, a wonderful poem by Emma Lazarus is engraved on a tablet.  It is called The New Colossus and is worth repeating:

> *Not like the brazen giant of Greek fame,*
> *with conquering limbs astride from land to land;*
> *Here at our sea-washed, sunset gates shall stand*
> *a mighty woman with a torch, whose flame*
> *is the imprisoned lightning, and her name*
> *Mother of Exiles. From her beacon-hand*
> *Glows world-wide welcome; her mild eyes command*
> *The air-bridged harbor that twin cities frame,*
> *"Keep, ancient lands, your storied pomp!" cries she*
> *with silent lips. "Give me your tired, your poor,*
> *Your huddled masses yearning to breathe free,*
> *The wretched refuse of your teeming shore,*
> *Send these, the homeless, tempest-tost to me,*
> *I lift my lamp beside the golden door!"*

We have come a long way from these sentiments.  Instead, in the halls of our immigration courts today, the sentiments all too often are more like "*don't let the door hit you on your way out.*"

There are no doubt many conscientious, dedicated, and thorough immigration courts across the country.  Unfortunately, their hard work is overshadowed by the significantly increasing rate at which adjudication lacking in reason, logic, and effort from other immigration courts is reaching the federal circuits.  *See e.g.*, *Benslimane v. Gonzales*, 430 F.3d 828, 829-30 (7th Cir. 2005) ("This tension between judicial and administrative adjudicators is not due to judicial hostility to the nation's immigration policies or to a misconception of the proper standard of judicial review of administrative decisions. It is due to the fact that the adjudication of these cases at the administrative level has fallen below the minimum standards of legal justice."); *Rexha v. Gonzales*, 2006 WL 229796, *5 n.3 (6th Cir. 2006) (noting that "horror stories persist of nasty, arrogant, and condescending immigration courts"); *Metko v. Gonzales*, 2005 WL 3420046 (6th Cir. 2005) (Martin, J., concurring) ("Although I am sympathetic with the difficulties faced by immigration courts and its caseload, it should be responsible for providing a complete and accurate determination on asylum claims. Let us not forget the impact of these hearings on the lives of the individuals involved. The least we can ask of the immigration court is to provide a thorough and complete analysis for its determination beyond identifying minor inconsistencies, cultural differences, or language barriers."); *Mece v. Gonzales*, 415 F.3d 562, 572 (6th Cir. 2005) ("The Board's failure to find clear error in the immigration judge's adverse credibility determination leaves us, we are frank to say, more than a little puzzled."); Adam Liptak, *Courts Criticize Judges' Handling of Asylum Cases*, N.Y. TIMES, Dec. 26, 2005, at A1.[1]

---

[1] *See also* Lisa Getter & Jonathan Peterson, *Speedier Rate of Deportation Rulings Assailed*, L.A. TIMES, Jan. 5, 2003, *available at* 2003 WL 24211941.  The article discusses the speedy rate at which the Board of Immigration Appeals decides cases and describes how two Board members each decided more than fifty cases on one day.  The means that if the Board members worked a 9 hour day without any breaks for the restroom, lunch, or otherwise, each case received approximately ten minutes of attention despite the fact that ordinarily, immigration cases produce records in the hundreds of pages, and that many of those seeking relief allege that they will be tortured or killed if deported.

The problem lies not only with the administrative courts, however, but also with the petitioners' own counsel. This case demonstrates as much. Ineffective assistance of counsel — or in immigration proceedings, due process of law — gets much more attention in criminal cases. But, the inadequacy and carelessness of some counsel has allowed or facilitated some of the problems in the immigration courts. Likewise, reviewing courts have been, in my opinion, unduly tolerant of ineffective counsel. Unfortunately, the realities of the situation prevent certain checks on counsel in immigration proceedings. It is quite difficult for a deported petitioner to sue his attorney for malpractice or to file complaints with the immigration courts. And, asylum seekers are politically powerless, voiceless, and often at the mercy of counsel and the courts. The issue, therefore, requires some self-policing. The immigration bar would be well served by strongly considering whether to promulgate certain standards of conduct — i.e., ABA-like Guidelines for the Performance of Counsel in Immigration Proceedings — that could assist counsel in representing immigration clients and also help the courts in evaluating counsel's performance. Although the immigration courts themselves have serious problems, it would be a disservice to claim that the problem lies only with the immigration courts.

Fortunately, with regard to administrative reform, the Attorney General of the United States recently acknowledged the problem in the immigration courts when he issued a memorandum to immigration judges and to the members of the Board of Immigration Appeals and also ordered the Deputy Attorney General and Associate Attorney General "to develop a comprehensive review of the immigration courts." The Attorney General's memorandum acknowledges that "there are some [immigration courts] whose conduct can aptly be described as intemperate or even abusive and whose work must improve." Whatever the impetus, *see Benslimane*, 428 F.3d at 830 ("All that is clear is that it cannot be in the interest of the immigration authorities, the taxpayer, the federal judiciary, or citizens concerned with the effective enforcement of the nation's immigration laws for removal orders to be routinely nullified by the courts, and that the power of correction lies in the Department of Homeland Security, which prosecutes removal cases, and the Department of Justice, which adjudicates them in its Immigration Court and Board of Immigration Appeals"), the Attorney General's reminder to those courts is a much needed one. To his credit, the Attorney General stated: "I urge you always to bear in mind the significance of your cases and the lives they affect. To the aliens who stand before you, you are the face of American justice. Not all will be entitled to the relief they seek. But I insist that each be treated with courtesy and respect. Anything less would demean the office that you hold and the Department in which you serve." This is a step in the right direction. A nation so concerned with freedom and liberty ought to accord a little more respect and dignity to those who seek from us that which we claim to be so proud to offer.

With these observations, I concur.

———————————

**DISSENT**

———————————

RONALD LEE GILMAN, Circuit Judge, dissenting. Because I believe that substantial evidence supports the IJ's adverse credibility determination, and because I am unpersuaded that N'Diom's ineffective-assistance-of-counsel claim entitles him to a remand, I respectfully dissent.

## I. ADVERSE CREDIBILITY DETERMINATION

The majority contends that a remand is necessary because the BIA failed to credit N'Diom's testimony or his explanations for the various inconsistencies. Its opinion, however, neither articulates nor follows the proper standard for reviewing an adverse credibility determination. Adverse credibility determinations are findings of fact that must be reviewed under the deferential "substantial evidence" standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 & n.2 (6th. Cir. 2004). Under this standard, we are not to reverse an IJ's factual determination as affirmed by the BIA unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original). The majority has apparently departed from this standard, remanding instead because the BIA "might . . . adjudicate[] N'Diom's case differently" if it emphasizes various factors that the majority considers relevant.

I also find unpersuasive the assertion of my colleagues that the "Board [did] not sufficiently articulate its reasoning nor evaluate the applicant's claim on the record considered as a whole." Maj. Op. at 6 (citation and quotation marks omitted). The record reflects that the opposite is true. In fact, the majority opinion itself cites instances in the record where the IJ referred to various discrepancies as forming the basis for his decision. The IJ's decision was based not only on the incompleteness of the asylum application, as the majority opinion contends, but also on the fact that N'Diom's testimony was inconsistent with his personal statement attached to the application. These inconsistencies convinced the IJ that N'Diom had embellished his story, and ultimately led to the IJ's adverse credibility determination.

The majority opinion further criticizes the IJ for relying on omissions as opposed to direct contradictions. Maj. Op. at 2-3 ("All of the so-called 'discrepancies' are simply omissions to state a particular detail. None are lies in the sense of a statement opposite to or inconsistent with a prior statement."). My colleagues overlook, however, a major discrepancy concerning N'Diom's allegations of torture in Libya. N'Diom, after claiming in his personal statement that he was physically and psychologically tortured in Libya, testified before the IJ that he was subjected to psychological torture only. Such a discrepancy certainly goes to the heart of N'Diom's claim, *see Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004), considering that N'Diom was relying on this evidence of torture to demonstrate his past persecution—a necessary prerequisite to obtaining asylum.

Moreover, this purported distinction between direct contradictions on the one hand and omissions on the other is not supported by our caselaw. *See Shkabari v. Gonzales*, 427 F.3d 324, 329 (6th Cir. 2005) (holding that "omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim") (citation and quotation marks omitted). In *Shkabari*, the Albanian petitioner applied for asylum on the basis that his leadership in the Democratic Party of Albania allegedly led to persecution in his native country. The *Shkabari* court affirmed an adverse credibility determination on the basis of two omissions: (1) Shkabari testified at his hearing before the IJ that he was the chairman of the Albanian Democratic Party, yet his asylum application failed to mention a leadership role, and (2) Shkabari claimed at the hearing that he was afraid to go to the hospital because the rival political party controlled it, yet he stated in his asylum application that he was treated at a local hospital after the

police burned him with scalding water.  *Id*. at 329-30.  These omissions were considered "major inconsistenc[ies]" by the *Shkabari* court because Shkabari's status as a leader of the Democratic Party, as well as his fear of the local hospital, "greatly enhanced his claim of persecution."  *Id*. at 329.

Here, as in *Shkabari*, the alleged testimonial facts that were omitted in N'Diom's asylum application, if believed, would amplify his persecution claim.  The last example of persecution reported in N'Diom's asylum application or in the notes of the Asylum Officer occurred in 1993.  N'Diom testified before the IJ, however, that he had been under house arrest from 1993 to 1997, that he endured a subsequent arrest in 1998,  and that his wife had died as a result of shock from his 1998 arrest.  Prior to N'Diom's testimony, as the IJ noted, his application and other materials portrayed him as "a person who had existed in a perfectly normal manner in his country for the last ten years."

These additional claims made during N'Diom's testimony led the IJ to conclude that N'Diom had "embellished his testimony" and "effectively created a new story" for the hearing.  The IJ's concern that N'Diom's "tale [of persecution] grew in the telling" heeds the warning in *Shkabari* that such exaggerations are often the result of a desire to enhance an immigrant's claim.  *See Shkabari*, 427 F.3d at 329.  I believe that the IJ was justified in determining that N'Diom's slew of new allegations at the hearing, none of which were supported by prior evidence in the record,  indicated his lack of credibility.

Contrary to the majority's assertion that the IJ and the BIA failed to consider N'Diom's explanations for these inconsistencies, a review of the record indicates otherwise.  In fact, the decision of the IJ acknowledges N'Diom's claim that he was told by the Asylum Officer to "keep it short," and the decision goes on to explain why N'Diom was still held responsible for the inconsistencies.  The IJ pinpointed the fact that the Asylum Officer specifically asked N'Diom whether anything had happened to him after his release from jail in 1993, and that N'Diom had disregarded this opportunity for elaboration by answering in the negative—even though he later testified that his wife's death, as well as his contemporaneous arrest, occurred in 1998. *Cf. Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004) ("An adverse credibility finding is not based on substantial evidence where [t]he BIA [or the IJ] *did not comment on [an applicant's] explanation* nor suggest *any reason* that it found his explanation not credible.") (emphasis added) (alterations in original) (citation and quotation marks omitted).

The majority opinion also places great emphasis on the fact that "[t]here is no indication in the record before us that the Immigration Judge or the Board took cognizance of the dire human rights situation in Mauritania or the mistreatment of the black African Fulani by the government." Maj. Op. at 5.  Its decision to remand is partly based on this purported oversight by the IJ and the BIA.  In the BIA's order, however, it explicitly considered the relevant country report and concluded:

> Because the respondent's testimony as to his political associations cannot be accepted as true and because the country conditions evidence of record shows that the Mauritanian government no longer expels or harms black Fulanis in a way that rises to the level of torture, the respondent is ineligible [for relief].

The assertion by the majority that the BIA's rejection of N'Diom's testimony was "questionable" because his testimony was "plausible and consistent with known facts about conditions in Mauritania" is therefore incorrect on two counts.  First, the BIA actually considered N'Diom's allegations in light of current conditions in Mauritania and determined that black Fulanis were no longer being persecuted to the extent claimed by N'Diom.  Second, and more importantly, the deferential substantial-evidence standard requires more than mere plausibility to disturb an adverse

credibility determination.  Because the record before us does not "compel" a contrary result, *see Marku*, 380 F.3d at 986, I would therefore affirm the adverse credibility determination.

## II.  N'DIOM'S INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIM

The majority opinion blames N'Diom's numerous discrepancies on his counsel, whom the majority characterizes as "clearly lacking in competence and diligence."  Maj. Op. at 6.  If counsel had properly presented certain evidence, the majority reasons, the BIA "*might* have adjudicated N'Diom's claim differently."  Maj. Op. at 6.  (Emphasis added.)  The majority opinion, however, fails to acknowledge that not only did the BIA consider and reject N'Diom's complaints about his counsel, but also that N'Diom's claim of ineffective assistance of counsel is not properly before us.

Because a deportation proceeding is civil rather than criminal, N'Diom's ineffective-assistance-of-counsel claim is reviewed pursuant to the Due Process Clause of the Fifth Amendment. *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003).  Ineffective assistance of counsel in this context will constitute a due-process violation "only if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case."  *Id.*  (citation and quotation marks omitted).  Moreover, consideration of N'Diom's ineffective-assistance-of-counsel claim by this court is appropriate only if N'Diom properly presented the merits of his claim to the BIA.  *See Ramani v. Ashcroft*, 378 F.3d 554, 560 (6th Cir. 2004).

An alien seeking to raise a claim of ineffective assistance of counsel in immigration proceedings is required to (1) set forth the relevant facts in an affidavit, (2) inform counsel of the allegations and provide counsel with an opportunity to respond, and (3) file a formal disciplinary complaint or explain why one has not been filed.  *Matter of Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1998); *see also Hamid v. Ashcroft*, 336 F.3d 465, 469 (6th Cir. 2003) (refusing to consider such a claim where the *Lozada* requirements were not satisfied).  The order of the BIA makes clear that N'Diom failed to properly raise his ineffective-assistance-of-counsel claim because he did not satisfy the conditions in *Lozada*, the failure of which prohibits us from considering his claim.  *See Ramani*, 378 F.3d at 560.  Moreover, even if N'Diom had properly raised the claim, the BIA opined that it would have considered his argument meritless because he was unable to show prejudice from his counsel's oversight.  BIA Op. at 2 ("We further note that the respondent has demonstrated neither the content of the testimonial and documentary evidence he sought to have admitted, nor how that evidence would have changed the outcome of this case.").

The majority opinion does not discuss the procedural requirements of *Lozada*, improperly considers N'Diom's complaints against his counsel in adjudicating this case, and assumes that the mistakes made by counsel were fatal to N'Diom's petition.  Maj. Op. at 5 ("The reason that N'Diom was unable to introduce any witness or documentary evidence corroborating his testimony was that his immigration lawyer at the trial did not understand or comply with the local [rules]").  As the BIA noted, however, N'Diom was unable to show that the introduction of this evidence would have altered the outcome of the case.  *See Sako v. Gonzales*, 434 F.3d 857, 864 (6th Cir. 2006) (holding that the alien "must establish that, but for the ineffective assistance of counsel, he would have been entitled to continue residing in the United States"); *see also Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) (holding that the alien "carries the burden of establishing that ineffective assistance of counsel prejudiced him").  This court has also emphasized that "[s]ound policy reasons support compliance with the *Lozada* requirements," one of which is to "discourag[e] baseless allegations."  *Hamid,* 336 F.3d at 469.

The majority opinion, by making no mention of *Lozada* and accepting at face value N'Diom's assertion that the excluded evidence would have proven the merits of his case, arguably requires a remand in every case in which an immigrant claims that his attorney was ineffective.

Such a position is not only contrary to the law of this court, *see Hamid*, 336 F.3d at 469, but would also swamp the already overburdened BIA with needless remands.

## III.  CONCLUSION

Because I am unpersuaded that the record compels a contrary conclusion as to the adverse credibility determination, and because I believe that the majority opinion improperly considers N'Diom's ineffective-assistance-of-counsel claim, I respectfully dissent.