**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0485n.06

No. 08-3928

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED
Jul 13, 2009
LEONARD GREEN, Clerk**

| | | |
|---|---|---|
| AMADOU SY, | ) | |
| | ) | ON REVIEW FROM THE |
| **Petitioner,** | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., | ) | **O P I N I O N** |
| ATTORNEY GENERAL, | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**Before: MCKEAGUE AND WHITE, Circuit Judges; and MARBLEY,[*] District Judge**

**WHITE, Circuit Judge.** Petitioner Amadou Sy requests that the court review the Board

of Immigration Appeals' (BIA) final decision denying asylum and withholding of removal under

the Immigration and Nationality Act (INA) and relief under the United Nations Convention

Against Torture (United Nations CAT). We **DENY** Sy's petition for review.

**I. BACKGROUND**

**A. Allegations Regarding Events in Mauritania**[1]

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District
of Ohio, sitting by designation.

[1]The ensuing facts are drawn from Sy's applications for asylum, testimony, and briefs.

Sy, a man of Fulani ethnicity, was born on November 2, 1960, in Mauritania. Before the government forcibly deported him to Senegal, Sy worked and lived at a BP-owned gas station in Kiffa, Mauritania, while the rest of his family, including his wife, lived in Boghe, Mauritania.

In April 1989,[2] Mauritanian police officers accused Sy of being a member of the political group FLAM (African Liberation Forces of Mauritania) and using money from his gas station to support FLAM.[3] Despite Sy's denials, the officers told him that he must leave the country. On April 19, however, the police arrested a man from Senegal at the gas station, told Sy he could not leave Kiffa, and ordered him to only give gas to official members of the government. According to his oral testimony, during this visit the police officers knocked Sy to the floor, tied him up, stepped on his hand, burned him with cigarettes, and beat him with sticks for two hours.[4] The officers then took

---

[2]It is not clear if the police first visited the gas station on April 1 or April 19. (*Compare* Supp. App. at 139, *with* Supp. App. at 165.)

[3]According to Sy, the officers were White Moors. Mauritania has a history of ethnic tensions between its black (Afro-Mauritanian) and White and Black Moor (Arab-Berber) populations. In 1989, a border dispute with Senegal led to widespread ethnic violence in Mauritania. At this time, White Moor authorities expelled thousands of Black Mauritanians to Senegal.

In recent years, the political landscape of Mauritania has been in a state of flux. A bloodless coup in 2005 upended the leading party's political control. Democratic elections in 2006-07 resulted in a new government and potential reforms on the human rights front, but another military coup this past August left things uncertain. The General who led the coup, Mohamed Ould Abdel Aziz, recently resigned in order to run for President in the upcoming July 18 election.

[4]The location and timing of this mistreatment was one of the inconsistencies which the IJ cited to support his adverse credibility determination. *See infra* Section II.

Sy to the police station, where they detained him for four hours. Upon his release, the officers told Sy he could not leave the country.[5]

Two months later police visited Sy and told him he could leave the country. Two days after that, the police returned to the gas station at approximately 5:00 pm and again took Sy to the police station, where officers interrogated him for two days. During these interrogations the police accused Sy of being a member of FLAM. The officers then moved Sy to the Nouakchott prison, where he remained for one month. During this time he shared a cell with ten other prisoners and received very little food. According to Sy's oral and written testimony, soldiers beat him and other prisoners, and when other prisoners died their bodies remained in the cell with survivors.[6]

When the authorities released Sy in July 1989, soldiers took him to the Senegal River, forced him to sign a confession, and placed him on a boat to Rosso, on the Senegal side of the border. When Sy reached Rosso, the Red Cross provided him with medical assistance and food. In Rosso, Sy also got to know a driver for BP, who put Sy in touch with his former employer. BP then provided Sy with a document confirming his former employment. The document allowed Sy to travel to Dakar, where he collected backpay from BP, found his family, and learned that his mother had died during the mass deportation of Black Mauritanians.[7]

---

[5]According to the asylum officer's Assessment to Refer, the officers also instructed Sy to visit the police station each day. When questioned about this on cross-examination, Sy said it was true but "when they trusted me they stop asking me to report everyday." (Supp. App. at 173.)

[6]Sy's description of his treatment in prison was one of the inconsistencies that the IJ cited to support his adverse credibility determination. *See infra* Section II.

[7]*See supra* note 3.

3

In Dakar, Sy received a certificate that verified his residency, though Sy points out that it did not offer any benefits in terms of citizenship, permanent residency, permanent resettlement, or the right to legally obtain employment.[8] Despite concerns about his safety and fears that he might be deported back to Mauritania, Sy remained in Senegal for nine years. According to Sy's testimony, he grew more concerned in 1997, when the chief of police, who blamed Sy for a fight at the school where he taught, threatened to deport Sy to Mauritania. After this event, the Senegalese police also began harassing Sy and asking him to come to the police station. As a result, in 1998 Sy made plans to go to the United States.

In order to travel to the United States, Sy contacted a Senator in the Senegalese Congress whose children attended the school where Sy taught the Koran. The Senator put Sy in touch with a man named Pape Diop, who provided Sy with a passport and traveled with him to the United States. Sy arrived in the United States on July 15, 1998.[9]

**B. Immigration Proceedings**

---

[8]According to Sy's oral testimony the document was,

> . . . just a certificate to show that you live in the neighborhood where you live and the chief of the neighborhood knows you. Anybody who goes to live in the neighborhood will go to the chief of the neighborhood and inform them that – and give them your address and they will give you a paper showing that you live in the neighborhood.

(Supp. App. at 156.)

[9]Sy's knowledge of the man's name was one of the inconsistencies which the IJ cited to support his adverse credibility determination. *See infra* note 13 and accompanying text.

4

In May 1999, Sy filed an application for asylum, withholding of removal, and protection under the United Nations CAT.[10] An asylum officer interviewed Sy and referred his application to the immigration court. On August 9, 1999, the Immigration and Naturalization Service served Sy with a Notice to Appear in removal proceedings, charging removability under § 237(a)(1)(A) of the INA. *See* 8 U.S.C. § 1227(a)(1)(A) ("Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable."); 8 U.S.C. § 1182(a)(7)(A)(i)(I) (identifying an alien without a valid unexpired visa or entry document as in a class of aliens ineligible for admission).

At a February 24, 2000 hearing, Sy admitted the allegations contained in the government's Notice to Appear and conceded removability. On August 26, 2000, Sy filed a second application for asylum. Following a November 14, 2006 individual merits hearing, the IJ denied all claims for relief and ordered Sy removed to Mauritania. As an initial matter, he held that Sy lacked credibility due to numerous inconsistencies between his written and oral testimony. The IJ also relied on inconsistencies, raised by the government on cross-examination, between Sy's testimony and the asylum officer's Assessment to Refer, and referenced a forensic report which failed to verify Sy's

---

[10]Sy's brief appears to claim that he filed his initial application on August 16, 1998 and August 16, 1999. (*Compare* Pet'r's Br. at 9, *with* Pet'r's Br. at 27.) The copy of the first application in the appendix contains no clear date. (Pet'r's App. at 58-65.) Since the government allows that Sy filed his application in May 1999 – which is within one year of Sy's alleged arrival in the United States on July 15, 1998 – this court adopts May 1999 as the date of the first application. (*See also* Supp. App. at 96 (IJ's decision indicating that Sy filed his first asylum application on May 3, 1999).) *See infra* note 16.

Mauritanian nationality card. Finally, the IJ cited Sy's failure to provide reasonably available corroborative evidence.

The IJ also held that Sy did not meet his burden of showing past persecution. In the alternative, he concluded that Sy was firmly resettled in Senegal. Though Senegal did not offer Sy permanent resident status or citizenship, the IJ held that "in the view of the Court, the respondent did have 'some other type of permanent resettlement.'" (Supp. App. 97.) He also held that the government met its burden of showing, by a preponderance of the evidence, that there was a fundamental change in country conditions in Mauritania.

Because Sy failed to meet his burden of showing eligibility for asylum, the IJ held that he failed to meet the higher burden for withholding of removal. Finally, the IJ concluded that Sy failed to establish eligibility for protection under the United Nations CAT.

Sy filed a timely Notice of Appeal with the BIA on December 8, 2006. On June 30, 2008, the BIA affirmed the IJ's decision. The BIA's opinion explained that "[a]though the record does not demonstrate that the Senegalese government made an offer of permanent resident status or citizenship to the respondent, he did receive 'some other type of permanent resettlement.'" (App. at 2.) The BIA also upheld the IJ's adverse credibility determination, concluding that the IJ "provided specific, cogent reasons related to the heart of the claim in support of an adverse credibility finding." (*Id.*) Specifically, the Board noted Sy's conflicting testimony regarding: 1) the man who traveled with him to the United States; and 2) his abuse at the hands of Mauritanian authorities. Further, due to these inconsistencies, the BIA held that "it was proper for the Immigration Judge to require corroborating evidence." (*Id.* at 3.)

6

Sy petitioned for review by this court on July 30, 2008.

## II. ANALYSIS

This court has jurisdiction to review a final order of removal by the BIA pursuant to 8 U.S.C. § 1252. In this case, the BIA issued an opinion when it affirmed the IJ's decision, basing its order on the IJ's factual findings. Section 1252 provides appellate courts with "jurisdiction to review the BIA's decision affirming the IJ's denial of asylum, withholding of removal, and relief under the Convention Against Torture." *Singh v. Ashcroft*, 398 F.3d 396, 400-01 (6th Cir. 2005). However, when a BIA opinion adopts the IJ's reasoning, this court has also reviewed portions of the IJ's decision directly. *Id.*

In removal proceedings, this court reviews legal conclusions de novo and "factual findings under the substantial evidence standard." *Ndrecaj v. Mukasey*, 522 F.3d 667, 672 (6th Cir. 2008) (factual findings); *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006) (legal conclusions). Under the substantial evidence standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. 1252(b)(4)(B)). This means that "the petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003); *see also Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) ("To reverse the BIA's determination we must find that the evidence 'not only supports a contrary conclusion but indeed *compels* it.'" (quoting *Yu*, 364 F.3d at 702)). An IJ's credibility determination is a factual finding subject to the substantial evidence standard. *Yu*, 364 F.3d at 703 ("Credibility determinations are findings of fact . . . .").

7

Under the INA, "the Attorney General may grant asylum to an alien" if "the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A). Pursuant to 8 U.S.C. § 1101, a refugee is any person outside of his or her country of nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

The applicant bears the burden of establishing refugee status. 8 U.S.C. § 1158(b)(1)(B)(i). The applicant may be able to meet this burden through his or her own testimony, without corroboration, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii); *see also id.* § 1158(b)(1)(A), (d) (mandating that the Attorney General establish procedures for the consideration of asylum applications).

To make such a showing, an applicant for asylum can establish that he or she suffered past persecution in the applicant's country of nationality on account of one of the aforementioned factors, creating a presumption that the applicant has "a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. §1208.13(b)(1); *see also Namo v. Gonzales*, 401 F.3d 453, 456 (6th Cir. 2005) ("The alien bears the burden of showing a 'clear probability' of such persecution."). However, an asylum officer or IJ may find the presumption insufficient if he or she finds, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" or "[t]he applicant could avoid future persecution

8

by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. §1208.13(b)(1)(i).

An applicant can establish a well-founded fear of persecution in the absence of past persecution if: 1) the applicant fears persecution in his or her country of nationality based on one of the aforementioned factors; 2) there is a reasonable possibility that the applicant would suffer such persecution; and 3) the applicant is "unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." *Id.* § 1208.13(b)(2).

An alien can also request withholding of removal under 8 U.S.C. § 1231(b)(3). According to that sub-section, the Attorney General may not remove an alien to a country if he finds that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). In withholding of removal proceedings, an alien receives a presumption of future persecution if he or she establishes past persecution. 8 C.F.R. § 1208.16(b)(1)(i). If, however, the applicant cannot establish past persecution, the Attorney General must only withhold removal if the applicant establishes "that it is more likely than not that he or she would suffer such harm." *Id.* § 1208.16(b)(1)(iii) (emphasis added).

Lastly, an alien can request protection under the United Nations CAT , though again, "[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see also id.* § 1208.18(a) (defining torture)). Notably, the "more likely than not" standard – utilized in withholding of removal and CAT proceedings – is higher than the "reasonable possibility" of

9

persecution standard applied in the asylum context. *See, e.g.*, *Bah v. Gonzales*, 462 F.3d 637, 643 (6th Cir. 2006); *compare* 8 C.F.R. § 1208.13 (establishing asylum eligibility), *with* 8 C.F.R. § 1208.16 (withholding of removal under the INA and CAT).

When an IJ decides an applicant's testimony "lacks credibility, the IJ must include in his or her decision 'specific reasons' explaining why the IJ reached such a conclusion." *Singh v. Ashcroft*, 398 F.3d 396, 402 (6th Cir. 2005). These reasons, in turn, must relate to "issues that go to the heart of the applicant's claim."[11] *Sylla*, 388 F.3d at 926. Furthermore, "[i]f discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n.7 (6th Cir.2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir.2000)).

In his oral decision, the IJ concluded that Sy was not credible because of inconsistencies between Sy's written asylum application and his oral testimony regarding, among other things: 1) the name – or lack of knowledge thereof – of the man who provided Sy with a false passport and traveled to the United States with him; 2) whether, during the week in which the police officers first visited his gas station, Sy was trying to locate his family who he heard had been deported; 3) when police officers burned Sy with cigarettes; 4) Sy's mistreatment at the prison in Nouakchott; 4)

---

[11]The REAL ID Act of 2005 (Pub. L 109-13, 119 Stat. 231) amended 8 U.S.C. § 1158(b)(1) to allow the trier of fact to make a credibility determination "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). This updated standard, however, "only applies to aliens who applied for asylum, withholding of removal, or other relief on or after May 11, 2005, the effective date of this division of the Act." *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). Sy filed his first application for asylum and withholding of removal in May 1999. *See supra* note 10.

whether Sy has any sisters; 5) and whether Sy knows how his mother died. (Supp. App. at 87-91.)

The IJ also noted that the asylum officer assigned to the case created a written assessment that

contained additional information which Sy failed to mention on direct examination. Given these

inconsistencies and concerns, the IJ also considered Sy's failure to present reasonably available

corroborative evidence, namely his lack of "affidavits or letters or other statement of corroboration

or support from his mother or his sisters or his son." (*Id.* at 95.)

The BIA opinion focused on three of the aforementioned inconsistencies: 1) whether Sy

knew the name of the man who traveled with him to the United States; 2) when and how the police

mistreated Sy in 1989; 3) and whether Sy knew how his mother died. The BIA held that "in light

of these discrepancies and the lack of adequate explanation, it was proper for the Immigration Judge

to require corroborating evidence."[12] (Pet'r's App. at 3.)

In this case, several of the "inconsistencies and omissions" relied on by the IJ are irrelevant

as they do not "go to the heart of the applicant's claim." *Sylla*, 388 F.3d at 926; *see also Mece v.*

*Gonzales*, 415 F.3d 562, 572 (6th Cir. 2005) ("[A]lleged 'inconsistencies and deficiencies' . . . come

nowhere close to supporting the conclusion that the substance of the claim of persecution is false.").

For example, the name of the man who traveled with Sy from Senegal to the United States, and Sy's

---

[12]Despite apparently agreeing with other rationales provided by the IJ, the BIA opinion relied on the three aforementioned inconsistencies (in addition to the lack of corroborating evidence) in affirming the IJ's credibility determination. (Pet'r's App. at 3 ("For these reasons, although we have not mentioned all of the reasons in support of the adverse credibility finding, we find no reversible error in the finding.").) Therefore, while many of the IJ's inconsistencies are irrelevant because they do not "go to the heart of the applicant's claim," this opinion focuses on those which the BIA cited in upholding the IJ's opinion. *Sylla*, 388 F.3d at 926.

11

knowledge thereof, provides no assistance in judging whether Sy suffered persecution in

Mauritania.[13]  *Cf., e.g.*, *Bibashani v. Ashcroft*, 124 F. App'x 361, 366 (6th Cir. 2005) (unpublished

disposition) ("[M]inor inconsistencies regarding how Petitioner obtained money to flee Albania do

not support an adverse credibility finding as to persecution).  Likewise, the specific cause of Sy's

mother's death is unrelated to *Sy's* mistreatment by the Mauritanian government and does little to

enhance his claim of persecution.  *See Daneshvar*, 355 F.3d at 623 n.7.

Petitioner's brief, however, does not attempt to rebut the IJ's reliance on inconsistencies in

Sy's relation of his mistreatment by police.  Sy's written statements vaguely recount where and when

Mauritanian authorities mistreated him.  According to Sy's second application for asylum:

> As soon as I learned of the deportation I tried to leave my job to try to locate my
> family.  The chief of police in Kiffa threatened me and told me that I could not leave
> Kiffa.  I explained that I was going to look for my family.  The chief of police
> continued to threaten me and he ordered me to be deported.  I was fired from my job,
> jailed, deported, and tortued [sic].  I was transferred to Nouackchott prison in April
> or June of 1989.  In prison I was tortured by the soldiers.  The torture included
> putting out thier [sic] cigaretts [sic] on my skin.  I still have burns on my arms
> shoulder and hands.  My wrist continue to have the marks of where ropes were tied

---

[13]According to Sy's second asylum application, the man who made arrangements for Sy to get a passport never gave Sy his name.  According to his oral testimony, however, Sy returned the passport to the man, whose name was Pape Diop, after they arrived in the United States.

On appeal, Sy argues that the IJ misinterpreted his testimony and wrongly concluded that the same man who gave Sy his passport traveled with him to the United States.  Sy's brief admits that in his asylum application he "stated that the man who assisted him in obtaining a passport never gave him his name." (Pet'r's Br. at 16.)  In contrast, "Petitioner always asserted that he knew the name of the man whom accompanied him to the United States." (*Id.*)

The record does not support this interpretation.  Sy's written submissions and oral testimony indicate that the man who provided the passport and the man who traveled with Sy to the United States were one and the same. (*See* Pet'r's App. at 55; Supp. App. at 134.)

tightly. On any given day I was repeadety [sic] kicked and beaten with the butt of the soldiers [sic] gun on my head, shoulder and neck. I was also placed in a very small cell with others. The cell was so small that we could barely breath. Many people died and were left in the cell with the living for days at a time. I had little food and had to live with my waste and the waste of others. I prayed to die rather than continue to live under those inhumane conditions.

(Pet'r's App. at 53.) During the hearing, Sy testified that the two police officers visited the gas station on April 19, 1989 and accused him of working for FLAM. During this visit, he alleges that they burned his back with cigarettes, beat him, and stepped on his hand. They then tied Sy's hands and took him to the police station where, after detaining him for four hours, the officers released him and told him he could not leave the country for two months. Sy then returned to the gas station where he continued working. Two months and two days later ("around the end of May – the beginning of June"), Sy testified that police officers returned to the gas station and brought Sy to the police station, where he remained for two days. (Supp. App. at 147.) They then moved him to Nouackchott prison where he was beaten with belts.

The IJ concluded that these two forms of testimony compared unfavorably, explaining,

. . . in his written asylum application the respondent indicates that he was burned with cigarettes after being transferred to Nouakchott prison, and in addition that he received other physical beatings and abuse in Nouakchott after being transferred there; yet, again, on November 14, 2006, in Court he claimed that this all happened on April 19th, the day he was arrested in Kiffa at the gas station. This seems to be significant [sic] contradiction or inconsistency in the view of the Court.

(Supp. App. at 89.)

The generalized nature of Sy's application – particularly with regard to sequence and timing – is the cause of some of the alleged inconsistency. This court has held that the "absence of specific incidents in the application . . . does not give rise to the inference" that the applicant is incredible.

13

*Liti v. Gonzales*, 411 F.3d 631, 638 (6th Cir. 2005). This is because "the circumstances surrounding

the application process do not often lend themselves to a perfectly complete and comprehensive

recitation of an applicant's claim to asylum or withholding." *Id.* (quoting *Secaida-Rosales v. INS*,

331 F.3d 297, 308 (2d Cir. 2003)); *see also Hamida v. Gonzales*, 478 F.3d 734, 739 (6th Cir. 2007)

(quoting *Liti*'s criticism of the application form). As this court recently explained in *Kaba v.*

*Mukasey*, 546 F.3d 741, 749-50 (6th Cir. 2008),

> . . . the mere failure of a petitioner to include every detail of an asylum claim in the
> application itself should not be considered fatal to a petitioner's request for relief.
> On the other hand, an application should contain at least some indication of the type
> of assertions that will be made in support of a claim.

In *Kaba*, the court concluded that the petitioner's "complete lack of specificity in both his original

and amended applications justifies the immigration judge's skepticism about the validity of those

claims in this matter." *Id.*

In this case, Sy's application did not completely lack specificity, but at least one

inconsistency supports the IJ's adverse credibility determination. In contrast to his oral testimony,

Sy's applications clearly stated that the torture he suffered – including being burned with cigarettes

– occurred in prison, rather than at the gas station. Further, the applications contained no mention

or even allusion to any mistreatment at the gas station, an event that was central to Sy's oral

testimony.[14] *See Berri v. Gonzales*, 468 F.3d 390, 395 (6th Cir. 2006). *But cf. Mece v. Gonzales*,

---

[14]Sy encourages the court to follow the Second Circuit's precedent and hold that an IJ must confront an applicant with nonobvious inconsistencies on which he or she might rely in order to give the applicant an opportunity to explain the inconsistency. *See Xue v. BIA*, 439 F.3d 111 (2d Cir. 2006). This court previously refrained from adopting this requirement in *Zhao v. Holder*, 2009 WL 1051299, *2-3 (6th Cir. April 20, 2009) (unpublished disposition):

415 F.3d 562, 572-73 (6th Cir. 2005) (holding a failure to detail that a beating occurred at the police station in an asylum application is not significant enough to support an adverse credibility determination).

It was not unreasonable for the IJ to hold that Sy should have provided additional corroborating evidence. Though the IJ mistakenly believed that Sy could obtain a letter or affidavit from his mother (despite Sy's testimony regarding her death), Sy did testify that he sometimes speaks with his wife and that he sends his family money. (Supp. App. at 180.) When questioned as to why he provided no corroborating letters, Sy testified that "[t]hey were writing letters maybe the lawyers did not, did not get those letters that they were writing them." (*Id.*)

While "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration," 8 C.F.R. § 1208.13(a), the Sixth Circuit has upheld the BIA's rule that "where it is reasonable to expect corroborating evidence . . . [t]he absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof." *Dorosh v.*

---

We note that the prophylactic rule adopted by the Second Circuit in *Ming Shi Xue* – requiring an Immigration Judge to give notice of putative contradictions that are not self-evident before he or she may rely on them – has not been adopted in any other circuit. *See e.g.*, *Sankoh v. Mukasey*, 539 F.3d 456, 469-70 (7th Cir. 2008). Nor do we have occasion to do so in this case.

On the one hand, the rule is not inconsistent with our requirement that credibility determinations not be based on irrelevant inconsistencies. On the other hand, the rule permits reliance on what could otherwise be considered irrelevant inconsistencies if the Immigration Judge had given the applicant prior notice. Inasmuch as the Immigration Judge did not explicitly give petitioner prior notice of his intent to rely on any non-dramatic or irrelevant inconsistencies, he could not, per the rule of *Ming Shi Xue*, rely on them – which places the Immigration Judge in substantially the same place as our general prohibition against reliance on irrelevant inconsistencies.

*Ashcroft*, 398 F.3d 379, 382 (6th Cir.2004) (quoting *In re S-M-J-*, 1997 WL 80984, 21 I. & N. Dec. 722, 724-26 (BIA 1997)). Because Sy's testimony "plausibly could be viewed as incredible, and certainly could be viewed as inconsistent . . . a fact finder reasonably could find that [Sy's] testimony, absent corroboration, was insufficient to meet his burden or proof." *Pilica v. Ashcroft*, 388 F. 3d 941, 954 (6th Cir. 2004).

Sy also argues that the IJ improperly relied on the "Assessment to Refer" and accompanying notes. An Assessment to Refer "is a document prepared by an asylum officer who 'meets informally with the applicant, considers the documents presented with the asylum application, then decides whether the matter should be referred to an IJ for formal adjudication." *Koulibaly v. Mukasey*, 541 F.3d 613, 620 (6th Cir. 2008). On cross-examination, the government used the Assessment to Refer in its effort to impeach Sy, pointing out issues Sy apparently raised with the asylum officer but failed to mention on direct examination.[15]

In *Koulibaly*, the Sixth Circuit adopted the Ninth Circuit's requirement that courts "ensure that there exists sufficient 'indicia of reliability' before relying upon an Assessment to Refer." *Id.*

---

[15]For example, according to the Assessment, Sy stated that

> . . . in April, he was placed under house arrest, told to stop working, and to report to the police station daily. The applicant stated that when he would go to the police station, the officers would call him names and beat him. The applicant would then be released and told to come back the next day.

(Supp. App. at 207.) The Assessment also mentioned that Sy claimed he was "forced to sign a confession" before his deportation from Mauritania, another issue that never came up on direct examination. (*Id.* at 94, 207.)

(citing *Singh v. Gonzales*, 403 F.3d 1081, 1089 (9th Cir. 2005)). In an effort to identify such indicia, the court quoted the Ninth Circuit's explanation of what an unreliable Assessment *lacked*:

> The Assessment To Refer does not contain any record of the questions and answers at the asylum interview, or other detailed, contemporary, chronological notes of the interview, but only a short, conclusory summary – essentially, an opinion. There is no transcript of the interview. There is no indication of the language of the interview or of the administration of an oath before it took place. The asylum officer did not testify at the removal hearing. Finally, the applicant was not asked at the hearing before the IJ about the accuracy of the asylum officer's report or given any opportunity to explain the discrepancies the asylum officer perceived.

*Id.* (quoting *Singh*, 403 F.3d at 1089-90).)

Sy's Assessment to Refer is accompanied by notes which include some of the questions posed to Sy and the answers he provided. The notes also indicate that Sy was "placed under oath." (Supp. App. at 208.) *See also* 8 C.F.R. § 208.9 ("The asylum officer shall have authority to administer oaths . . . ."). Yet there is no transcript of the interview and the asylum officer did not testify at the removal hearing. Furthermore, the asylum officer's notes provide no indication of the language of the interview and Sy's brief points out that "it is not clear whether the petitioner even understood the questions posed to him, since the interview was conducted in a language other than his own." (Pet'r's Br. at 23.) *See also* 8 C.F.R. § 208.9 (9) (explaining that an "applicant unable to proceed with the interview in English must provide, at no expense to the Service, a competent interpreter," restricting who can serve as the interpreter, and directing that "[f]ailure without good cause to comply with this paragraph may be considered a failure to appear for the interview for purposes of § 208.10.")

The facts in this case present a very close call regarding the reliability of the Assessment to Refer. However, because we find that substantial evidence, independent of the Assessment to Refer, supports the IJ's adverse credibility determination, we see no reason to reach the reliability of the Assessment in this case.[16]

For these reasons, and despite rejecting some of the inconsistencies relied on by the BIA, we hold that substantial evidence supports the IJ's adverse credibility determination.[17] The adverse

---

[16]For the same reason, we do not reach the BIA's firm resettlement determination.

Sy further requests that this court reject the BIA's conclusion that Petitioner did not meet his burden of showing that he: 1) suffered past persecution on account of his race, membership in the Fulani ethnic group, and imputed political opinion and 2) has a well-founded fear of future persecution in Mauritania. The primary problem with this argument is that the BIA never reached these issues. Instead it affirmed based on the IJ's adverse credibility and firm resettlement determinations and explicitly noted that it "need not address the alternate finding that respondent failed to establish eligibility for relief even assuming that he testified credibly." (Pet'r's App. at 3.)

Sy also disputes the IJ's conclusion that he failed to establish, by clear and convincing evidence, that he filed his asylum application within one year of entering the United States. Sy argues that "[t]he record speak for itself and clearly establishes that petitioner entered that United States on July 15, 1998 and filed his application for asylum on August 16, 1998." (Pet'r's Br. at 26.) *See also supra* note 10.

Under 8 U.S.C. § 1158(a)(2)(B) an alien cannot apply for asylum unless he or she "demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." At Sy's hearing, the government argued that he "did not make a timely filing because he has no proof of entry." (Supp. App. at 193.) Though the IJ agreed that Sy had not carry his burden on this issue, we note that he ultimately concluded that because the Government's own charging document adopted the date on which Sy alleged he entered the country – a date which placed Sy's application within one year – he would not bar the asylum application on late filing grounds. (Supp. App. at 96.) *Cf. Amir v. Gonzales*, 467 F.3d 921, 924 (6th Cir. 2006) (noting the appellate court's limited ability to review applications denied for untimeliness).

[17]Nevertheless, we take this opportunity to reinforce the guidance this court provided in *Hamida v. Gonzales*, 478 F.3d 734, 740 (6th Cir. 2007):

18

credibility determination therefore precludes relief on Sy's claims for asylum, withholding of

removal, and withholding under the CAT. *See El-Moussa v. Holder*, — F.3d —, 2009 WL 1675754,

at *6 (6th Cir. June 17, 2009) (unpublished disposition).

### III. CONCLUSION

For the aforementioned reasons, this court **DENIES** Sy's petition for review of the BIA's

final order denying his application for asylum and related relief.

---

While our analysis reveals, on balance, that the IJ's adverse credibility finding is supported by substantial evidence, we take issue with many of the alleged "inconsistencies" the IJ deemed necessary to rely upon – some of which are not true inconsistencies or are so irrelevant that we are left with the impression that the IJ reached for anything he could find. This does not assist us in our review, and therefore we encourage IJs to concentrate their efforts on relevant and legitimate inconsistencies. *See N'Diom v. Gonzales*, 442 F.3d 494, 501 (6th Cir.2006) (Martin, J., concurring) ("The least we can ask of the immigration court is to provide a thorough and complete analysis for its determination beyond identifying minor inconsistencies, cultural differences, or language barriers.") (citation omitted).